76

DAVID TOMA, PETITIONER-APPELLANT, v. STATE OF NEW JERSEY, BOARD OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT SYSTEM,[1] RESPONDENT.

**Superior Court of New Jersey
Appellate Division**

Submitted October 10, 1979—Decided January 10, 1980.

---

[1]Corrected title. Appellant's notice of appeal erroneously refers to respondent as "State of New Jersey, Board of Trustees, Division of Pensions, Public Employers Retirement System, Department of the Treasury."

Before Judges CRANE, MILMED and KING.

*Martin F. Kronberg*, attorney for appellant.

*John J. Degnan*, Attorney General of New Jersey, attorney for respondent (*Stephen Skillman*, Assistant Attorney General, of counsel; *Samuel J. Halpern*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MILMED, J. A. D.

■ Petitioner David Toma appeals from a final determination of the Board of Trustees of the Police and Firemen's Retirement System (Board) denying his application for acciden-

tal disability retirement benefits under *N.J.S.A.* 43:16A 7.[2] In essence, he contends that his application to the Board was timely filed[3] and that the Board's determination is not supported by the evidence.

Petitioner, now 46 years old, was enrolled in the Police and Firemen's Retirement System effective December 27, 1956, while employed as a police officer for the City of Newark. He attained the rank of detective in 1962 and continued in that position until his last day of active service on July 30, 1973. On April 2, 1975 he filed an application for accidental disability retirement. The Board of Trustees of the Police and Firemen's Retirement System (Board) denied the application. Petitioner appealed and a hearing was held in the Division of Pensions (Division).

At the Division hearing petitioner described a series of nine on-the-job injuries, *viz.*:

(1) On April 10, 1959, while making an arrest, he "was bitten on the [thumb of his] left hand by a prisoner . . ." He was taken to City Hospital and treated for blood poisoning. As a result of the incident his thumb "is just in bad shape."

(2) On September 24, 1960, while trying to subdue a violent 300-pound mental patient, he was thrown to the floor. He

[2]It appears that petitioner's notice of appeal to this court was filed well beyond the time limited therefor by *R.* 2:4 1(b). By letter of March 27, 1978 to petitioner's then attorneys, with copy thereof to petitioner, the Chief of the Police and Fire Bureau of the Board gave notice of the Board's final administrative determination in the matter. It was not until December 6, 1978 that petitioner's notice of appeal was filed with the clerk of this court by his present attorney. No application for extension of time to file had been made under *R.* 2:4- 4(a). We disapprove of this disregard of the pertinent rules of court. We note, however, that respondent, although mentioning the late filing, does not challenge the timeliness of the appeal. In the circumstances, and since we perceive substantial merit in the appeal, we proceed as if the appeal had been timely filed. *R.* 1:1 2.

[3]Respondent does not question the timeliness of petitioner's application and, from our review of the record, we perceive no basis for petitioner's apparent concern in regard to that matter.

experienced "tremendous pain" in his "lower spine," had difficulty walking, and was taken to St. Michael's Hospital where he "was put into traction for almost six weeks." For six months after leaving the hospital he was given heat treatments in the doctor's office "three or four times a week."

(3) On May 8, 1961, while assisting in the removal of a sick person to an ambulance, his left hand was lacerated when it "got caught in the stretcher." He was taken to City Hospital where the wound was sutured.

(4) On December 22, 1961, while assisting in the rescue of several persons in an apartment house fire, he was overcome by smoke and rushed to City Hospital where oxygen was administered to him for several hours.

(5) On July 14, 1967, during the riots in Newark, while climbing a fire escape under gunfire, he fell and sustained a "very bad" ankle sprain.

(6) On October 10, 1968 he was beaten about the head and face and stabbed while attempting to break up a fight in a diner. He was rushed to St. Michael's Hospital. His resulting injuries were: a "bad concussion," a fracture of his jaw resulting in a persisting impairment of the functioning of his mouth (he is unable to eat solid foods), and headaches, dizziness and a partial loss of hearing.

(7) On January 2, 1969, while lifting crates containing confiscated phonograph records, his "legs went out completely." His body "become twisted" and he was unable to walk.

(8) On September 16, 1971 his left foot was lacerated when a large garbage barrel, located outside of the office out of which he was then working, tumbled over and struck him as he passed by. The foot required suturing.

(9) On September 28, 1971, as he was walking up a stairway in the Essex County Courthouse where he was scheduled to testify, he "felt a tremendous pain in [his] lower spine." His "whole body became twisted," and he had to be brought downstairs by other policemen.

Petitioner also testified that he suffered on-the-job traumatic experiences on many other occasions. The sum total of his injuries left him with a number of impairments. At the time of the hearing in the Division he was wearing a lumbosacral back brace. He testified that he has to wear "a bite plane" in his mouth "all night long." If he does not wear it his mouth "is paralyzed" when he gets up in the morning. His mouth and teeth have "shifted." He has to exercise his mouth several times a day to keep it "lubricated." When he talks, eats or drinks he hears a "squishing" or "clicking" sound. He has "tremendous" headaches on the left side of his head. He cannot sleep in a bed. He has to sleep in a reclining chair. He takes pills for his dizziness. He cannot sit or stand "too long." He has limited movement in his neck and arms.

In addition to his physical complaints, petitioner described the psychological pressure which he felt from the continuing threats against him and his family's safety emanating from his many years of police work exposing criminal activities. His wife corroborated his physical complaints. She also described the threatening telephone calls received and petitioner's excessive fears for the safety of himself and his family, and concluded that "[h]e is totally neurotic."

Dr. Robert E. Green, a neurosurgeon, Dr. David J. Flicker, a psychiatrist and neurologist, Dr. Patrick J. Strollo, a dentist, and Dr. Robert E. McCutcheon, a chiropractor, testified on behalf of petitioner. Dr. Green gave Toma a neurological examination on December 26, 1975. At that time he reviewed a record of petitioner's work-connected injuries. His diagnosis was: a chronic herniated lumbar disk (L 5 S 1), cervical myositis, radiculitis and an injured left temporal mandibular joint. In his opinion petitioner was totally and permanently disabled from performing his duties as a police officer, and his condition "will not improve or change significantly." He concluded that this disability resulted from the cumulative effect of all of Toma's work-connected injuries.

Dr. Flicker conducted a psychiatric and neurological examination of petitioner on May 27, 1977. He concluded that Toma "was unmistakably a psychoneurotic," that he "had been one for many years," and that "his condition was probably worsening." He "thought there were some elements of early decompensation," a loss of ability to function—here, a disabling stage of nervousness and anxiety. He further concluded that petitioner is permanently and totally disabled from functioning as a police officer, and that his total work experience as a police officer brought about his neurosis. He attributed petitioner's mental disability to the psychological effects of his many on-the-job injuries. He thought Toma "had the neurotic problem most of his life," and that it was "brought to a head by police work," i. e., his "doing undercover work" and being "constantly exposed to a pattern of pressure and tension."

Dr. Strollo saw Toma on October 11, 1968, the day after the violent attack upon him at the diner. He found traumatic injuries of the maxilla and mandibula. The "lower denture was distorted beyond repair and there was a fracture of the lower right molar and a dislocation of the upper left temporal mandibular joint." At the time of the Division hearing on July 20, 1977 petitioner was still undergoing treatment for the effects of the injuries. Dr. Strollo concluded that Toma has "a chronic arthritic condition of the upper left mandibular joint," a "permanent disorder," which prevents him from fully opening or closing his mouth, and that this condition is a direct result of the October 10, 1968 injuries and is likely to get worse.

Dr. McCutcheon described his periodic treatment of petitioner from March 22, 1969, when Toma complained of low back pain after he moved furniture at the Newark Police Department. Based upon his then most recent examination of August 23, 1977 Dr. McCutcheon concluded that Toma was permanently and totally disabled "[b]ecause of the unstable low back condition that he has and has experienced now for eight years."

Dr. William Kruger, an orthopedic surgeon who examined Toma on November 12, 1975, was the sole medical expert to testify on behalf of respondent Board. His diagnosis was that petitioner "had a sprain or contusion of his left shoulder and may have a sprain of his lower back." On the basis of a hypothetical question incorporating medical reports and hospital records in the case, it was his opinion that Toma "was able to perform the duties of a police officer," either as "a detective or as a regular patrolman." He did not "feel that the situation was that bad that he [petitioner] could not function." He made it clear, however, that he was referring to "orthopedic symptoms" only and had not gone "into the question of his [petitioner's] physical and mental or dental problems."

Hubert Williams, the Police Director of the Newark Police Department, also testified on behalf of the Board. He said that Toma "was a good detective in the Police Department" and that "he specialized basically in gambling enforcement and he worked through investigations and a larger per cent of his time was spent doing undercover work." He also said that "there is work available in the Community Relations Bureau" of the Department that Toma could do and, additionally, "there is a new Decoy and Disguise Unit" in the Department "and there are functions there that he can perform." He listed, as functions which petitioner could perform: "Lecturing, advising, counseling, assisting," and "program management." The remainder of the proofs was documentary in nature.

The hearing officer who presided at petitioner's administrative appeal found, among other things: that "[p]etitioner is permanently and totally disabled from performing any duties whatever as a police officer"; that his disability "is not directly, proximately and causally related to the alleged traumatic events in question, but rather is the cumulative result of both the injuries suffered in the work incidents, psychiatric sequelae and progressive deterioration"; that he "has failed to prove by a preponderance of the credible evidence a work event or events

directly resulting in permanent and total disability, directly related to or directly resulting from the performance of his regular or assigned duties as specified in N.J.S.A. 43 16A 7," and that he "meets all the requisites of an ordinary disability retirement allowance." He recommended that the decision of the Board of Trustees denying petitioner's application for accidental disability retirement under *N.J.S.A.* 43:16A 7 be affirmed. He further recommended that petitioner be granted an ordinary disability retirement under *N.J.S.A.* 43:16A 6. The Board adopted the hearing officer's findings and conclusions, approved his recommendations, and affirmed the denial of petitioner's application. This belated appeal followed.

The applicable statute, *N.J.S.A.* 43:16A 7, provides in pertinent part in paragraph (1), that a member of the retirement system in service may, upon written application,

> . . . be retired . . on an accidental disability retirement allowance; provided, that the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

In *Cattani v. Police & Firemen's Retirem. Sys. Bd. of Trustees*, 69 *N.J.* 578 (1976), the court pointed out that

> Trauma has been defined as "a wound; any injury to the body caused by external violence." *Black's Law Dictionary*, (4 ed. 1951); see also, *Schmidt's Attorneys' Dictionary of Medicine* (1975). The phrase "traumatic event" would ordinarily involve a mishap or accident involving the application of some kind of external force to the body or the violent exposure of the body to some external force. See 42A *Words and Phrases, Trauma; Traumatic*, p. 3 (4 Ed. 1951). [at 586]

It was recognized, however, that

. . . a traumatic event may possibly be found in some situations which do not literally fall within the external force or violence concept but still might be regarded as having traumatic origin [and that] a basis for an accidental disability pension would exist if it were shown that the disability directly resulted from the combined effect of a traumatic event and a preexisting disease. [*Id.*]

■ Here, it is apparent from the proofs, and the hearing officer virtually conceded, that each of the on-the-job incidents of April 10, 1959, September 24, 1960, December 22, 1961, October 10, 1968 and September 16, 1971, was a "traumatic event" as that term is used in the statute and construed in *Cattani, supra*.[4] See *In re Iannelli*, 157 *N.J.Super.* 324 (App.Div. 1978), certif. den. 77 *N.J.* 488 (1978). We note that while the hearing officer properly concluded that

. . . [petitioner, in his] present condition is less than a mere shadow or shell of his former self, the core and substance having been decayed and withered by repeated injuries, trauma, physical abuse and perhaps most significantly by the mental, neurological, psychological and psychiatric effects of the cumulative effect of torturous pain and the emotional repercussions of the horrors associated with his constabulary duties [;]

and that

In light of the conclusive persuasiveness of the medical testimony as to the totality and permanency of Petitioner's disability, it necessarily follows that Petitioner is unable to perform any police functions whatever for or on behalf of the Police Department of the City of Newark [;]

---

[4] Of the four events found by the hearing officer to be nontraumatic, we are satisfied that two were definitely traumatic, *viz.*, the July 1967 incident when Toma fell and dangled by his foot from a fire escape while trying to avoid being shot in the Newark riots, and the May 1961 laceration of his left hand which occurred while he was assisting in the removal of a sick person on a stretcher to an ambulance.

he clearly was mistaken in his interpretation and application of the relevant principles of law. Thus we are convinced that where, as here, the evidence demonstrates that the member's permanent and total disability has been directly brought on by a combination of traumatic events occurring during and as a result of his performance of his regular or assigned duties, and "was not the result of the member's willful negligence" the statutory criteria are satisfied even though the precise contributory role of each event separately may be uncertain. We so hold. Petitioner is, accordingly, entitled to an accidental disability retirement allowance under *N.J.S.A.* 43:16A 7.

The determination of the Board of Trustees under review is reversed and the matter is remanded to the Board with direction that petitioner be awarded an accidental disability retirement allowance. We do not retain jurisdiction.