JOSEPH GERBA, RESPONDENT, v. BOARD OF TRUSTEES OF
THE PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, APPELLANT.

Argued November 14, 1979—Decided June 12, 1980.

*Erminie L. Conley,* Assistant Attorney General, argued the cause for appellant (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stacy L. Moore, Jr.,* Deputy Attorney General, on the brief).

*Joseph Gerba* argued pro se.

The opinion of the Court was delivered by

HANDLER, J.

The issue presented by this appeal is whether an accidental disability retirement pension may be granted to a public employee under the Public Employees' Retirement System (PERS), *N.J.S.A.* 43:15A–1 *et seq.,* where it appears that the particular employee's disability was caused by traumatic physical injury combined with a preexisting arthritic condition. In the specific terms of the statutory provision governing PERS accidental disability retirements, *N.J.S.A.* 43:15A–43, the question is whether such a disability can be considered "accidental" as a "direct result of a traumatic event" or whether it must be regarded as "ordinary" because it "result[ed] from a . . . musculo-skeletal condition which was not a direct result of a traumatic event." Resolution of this question calls for a more extended analysis of a similar issue addressed by this Court in *Cattani v. Board of Trustees, Police & Firemen's Retirement System,* 69 *N.J.* 578, 586 (1976), wherein it was broadly recognized that under some circumstances an accidental disability could involve a combination of both a traumatic physical injury and an underlying disease or condition.

I

The facts reveal that Joseph Gerba ("respondent" or "Gerba") became a member of PERS in connection with his employment by the City of Bayonne. Prior to his going to work for Bayonne in April 1960, respondent had experienced at least three rather serious work-related injuries or medical conditions: in 1948, a crushed right hand; sometime in the 1950's, a shoulder and back condition necessitating a sympathectomy (the excision of a segment of a sympathetic nerve or sympathetic ganglia); and in 1956, a broken bone in his right foot. He also reportedly had

suffered from other ailments as well, *e. g.*, bleeding ulcers in 1962 or 1963.

In September 1964 Gerba, in his capacity as a municipal landfill attendant, sustained another on-the-job injury. He was struck and knocked down by a truck and a "load of pallets" fell upon him. Bleeding from the neck and somewhat dazed, he was taken immediately to a hospital for treatment where he was admitted and remained for two weeks. Since his injuries were related to his spine and neck, part of the treatment consisted of traction. For four and one-half years after his discharge from the hospital Gerba wore a cervical collar or neck brace on physician's advice and used prescribed medication for pain relief.

Ten days after his release from the hospital in 1964, somewhat less than a month after the date of the accident, Gerba returned to his job at the city landfill performing the same duties that he had performed prior to the accident. He remained at this job until sometime in 1969, although he admits to having missed some work time in that period because of effects of the 1964 injury. He continued to take the prescribed pain medication while on this job, and, as a result, he repeatedly fell asleep on duty, which resulted in certain disciplinary actions being taken against him. It appears that respondent ceased wearing the cervical collar in 1969 and stopped his medication before 1973.

In 1969 Gerba became a security guard for Bayonne. In May 1973, while on an hourly inspection of vehicles at the municipal garage, Gerba slipped on an oil spot or spill and fell against a parked truck, striking his lower back. He apparently worked the remainder of his shift and then went to see Dr. Sidney Chayes, the doctor for the City of Bayonne. Dr. Chayes taped up respondent's back, provided a prescription for pain-relieving medication, and advised him to self-administer heat treatments; he did not send Gerba to an emergency room or hospital nor did he recommend the taking of X-rays. Although respondent continued to take pain medication, he missed no time from work as a result of this 1973 incident and remained employed by the city as a security guard through September 1975.

Through January 1974 Gerba saw no other doctor. However, still experiencing back pain, he consulted Dr. S. J. LaPilusa, his personal physician who had treated him after his 1964 accident. Dr. LaPilusa ordered X-rays and suggested a hospital stay in traction for respondent. Gerba opted, however, for daily home traction. He continued periodic consultations with Dr. LaPilusa who diagnosed Gerba's condition as arthritis of the neck and spine for which he prescribed various pain-killing drugs.

Effective September 18, 1975, Gerba resigned his security guard position with the City of Bayonne and became a security guard with a private employer. He subsequently was employed as a security guard with another private employer and remained at this last position until April 1978 after which time he apparently ceased active employment.

On September 12, 1975, six days before going off the city payroll, Gerba filed to withdraw his contributions from PERS. When he subsequently received a check in excess of two thousand dollars, the Division of Pensions notified him that all his rights, claims and privileges had been terminated. In the summer of 1976, while employed as a private security guard, Gerba, pursuant to *N.J.A.C.* 17:2–6.1, filed an application (or applications) for a service retirement allowance under *N.J.S.A.* 43:15A–47. By letter of September 27, 1976, PERS awarded Gerba a service retirement pension of $57.44 monthly retroactive to September 1, 1976, the low amount due in part to respondent's failure to repay the previously withdrawn contributions.

Gerba started receiving service retirement allowance checks, but, realizing that he was not receiving the higher benefits attributable to an accidental disability, he returned "all of that [service retirement] money" and in November 1976 (and on March 11, 1977, as well) applied to PERS for an accidental disability retirement pension under *N.J.S.A.* 43:15A–43. The Board denied this application and reaffirmed its approval of Gerba's application for service retirement benefits. Gerba appealed the denial of his application for accidental retirement benefits pursuant to *N.J.A.C.* 17:2–1.7.

A hearing was held before a Division of Pensions hearing officer. The sole witnesses at that hearing were Gerba himself, appearing *pro se*, and Dr. William Kruger, an expert in orthopedics, who had examined respondent in January 1977 on behalf of the Division of Pensions. The record contained the Disability Evaluation of Dr. Kruger prepared on behalf of the State's Division of Pensions in which the doctor concluded that the two work-related episodes "while not actually causing his disability, contributed to the underlying condition or contributed to the symptoms produced by the underlying condition and leading to his present state of being totally and permanently disabled." At the hearing Dr. Kruger characterized Gerba as "permanently disabled for a lot of different jobs because of the arthritis in his neck and back . . . ." Nevertheless, Gerba was not, in Dr. Kruger's opinion, unable to work as a security guard so long as cold and damp conditions were avoided. Dr. Kruger's diagnosis was that Gerba's "continuing difficulty [was] due to arthritis in his neck and lower back" and that the "basic direct cause of [his relative] permanent and total disability" was "[h]is arthritis in his neck and back." Dr. Kruger further opined that neither the 1964 nor the 1973 injury contributed to the progression of respondent's arthritis since "trauma does not cause or stimulate arthritic changes."

The report of Dr. LaPilusa, which was also admitted into evidence, contained a diagnosis of cervical and lumbar arthritis and expressed the view that the 1964 trauma could have been an aggravating factor with respect to Gerba's permanent and total disability. In addition, the record contained the report of Dr. Jack Sall, who had examined Gerba on July 18, 1977 in connection with his claim for workers' compensation. Dr. Sall found that the sum total of his disabilities, including residuals of a crush injury to the right hand with a resultant right shoulder capsulitis and synovitis, a crush injury to the right foot and ankle, a right inguinal hernia, and a residual of a lumbodorsal strain, resulted in 100% disability under appropriate workers' compensation standards.

The Division of Pensions hearing officer's report recommended affirmation of the denial of Gerba's application for accidental disability retirement. The Board of Trustees, in ruling on the appeal, adopted the hearing officer's recommendation and affirmed its initial denial of claimant's application. Respondent appealed *pro se* to the Appellate Division which, in an unreported *per curiam* opinion, reversed the Board's determination and remanded with direction that Gerba be awarded the requested accidental disability pension. The court found that both accidents suffered by Gerba, *i. e.*, the 1964 landfill accident and the 1973 municipal garage accident, were "traumatic event[s]" within the meaning of *N.J.S.A.* 43:15A–43 as interpreted by *Cattani v. Board of Trustees, PFRS, supra*, and that Gerba's disability, found to be full and permanent, was a direct result "from the combined effect of [these] traumatic event[s] and a preexisting [osteoarthritic] disease." PERS filed a petition for certification which was granted on May 30, 1979. 81 *N.J.* 276 (1979).

## II

The statutory provision which enables a public employee who is a member of PERS to retire upon an accidental disability is *N.J.S.A.* 43:15A–43. Such disability must be total and permanent and must be a "direct result" of a work-related traumatic event in order to justify the increased retirement benefits awarded with an accidental disability.[1] The precise language articulating this standard is as follows:

---

[1]Under PERS accidental disability retirement benefits are greater than benefits based upon an ordinary disability retirement. Compare *N.J.S.A.* 43:15A–46 with *N.J.S.A.* 43:15A–45. See *Cattani v. Board of Trustees, PFRS*, 69 *N.J.* 578, 580 n. 1 (1976); *Magnani v. Board of Trustees, PERS*, 142 *N.J.Super.* 262, 264 n. 2 (App.Div.1976). This is characteristic of all the state pension systems, *e. g., N.J.S.A.* 18A:66–42 (accidental) and *N.J.S.A.* 18A:66–41 (ordinary) (Teachers' Pension and Annuity Fund); *N.J.S.A.* 43:7–12 (both provisions) (Prison Officers' Pension Fund); *N.J.S.A.* 43:8A–9(2) (accidental) and *N.J.S.A.* 43:8A–8(2) (ordinary) (Alcoholic Beverage Law Enforcement Officers' Pension Fund); *N.J.S.A.* 43:10–5.2 (accidental) and *N.J.S.A.* 43:10–5.1 (ordinary) (county employee pension funds); *N.J.S.A.* 43:13–22.55(b)

A member who has not attained age 65 shall, upon the application of the head of the department in which he is employed or upon his own application or the application of one acting in his behalf, be retired by the board of trustees, if said employee is permanently and totally disabled as a *direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties,* on an accidental disability allowance. [*N.J.S.A.* 43:15A–43 (emphasis added).]

*N.J.S.A.* 43:15A–43 also contains this additional language:

Permanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability.

The significance of this rather painstaking dual definition of an "accidental disability" for PERS pension retirement purposes emerges from a review of its history. The Public Employees' Retirement System (PERS) was created by statute in 1954. *L.* 1954, *c.* 84. That legislative act, then entitled the Public Employees' Retirement-Social Security Integration Act (*L.*1954, *c.* 84, § 84), read with respect to accidental disabilities as follows:

A [PERS] member who has not attained age 70 shall . . . be retired by the [PERS] board of trustees, if said employee is disabled as a result of personal injuries sustained in or from an *accident arising out of and in the course of his employment,* on an accidental disability allowance. [*L.*1954, *c.* 84, § 43 (emphasis added).]

The key consideration in evaluating accidental disability retirement claims under the original statute was thus whether the alleged disability was the result of an "accident arising out of and in the course of [the employee's] employment."

This language virtually duplicated that found in the statute governing workers' compensation. *N.J.S.A.* 34:15–1. It is not surprising, therefore, that in the early applications of the accidental disability provisions of PERS, the courts were influenced strongly by developments in the workers' compensation field. In *Roth v. Board of Trustees, PERS,* 49 *N.J.Super.* 309, 317 (App.Div.1958), for example, an action to recover PERS accidental death benefits, the court followed the broad standards for employment-relation in the workers' compensation field. It held

(accidental) and *N.J.S.A.* 43:13–22.55(a) (ordinary) (municipal employee pension funds); *N.J.S.A.* 43:16A–7(2) (accidental) and *N.J.S.A.* 43:16A–6(2) (ordinary) (Police and Firemen's Retirement System).

that accidental benefits, as opposed to "ordinary" benefits, were allowable because an underlying fatal disease was "activated" by an employment injury. This approach, paralleling workers' compensation law, was followed by courts dealing with like provisions for accidental disability retirement benefits in other state pension systems. *E. g., Getty v. Prison Officers' Pension Fund,* 85 *N.J.Super.* 383, 390 (App.Div.1964); *Fattore v. PFRS,* 80 *N.J.Super.* 541, 549 (App.Div.1963), certif. den. 41 *N.J.* 245 (1963); *Kochen v. Consolidated Police & Firemen's Pension Fund Comm'n,* 71 *N.J.Super.* 463, 477 (App.Div.1962); see also Ackerman, "Justice Francis and Workmen's Compensation," 24 *Rutgers L.Rev.* 458, 473 n. 91 (1970).

The uncritical application of workers' compensation standards to the public pension field was questioned in some cases. In *Wagner v. Board of Trustees, PERS,* 87 *N.J.Super.* 498, 505 (App.Div.1965), certif. den. 45 *N.J.* 300 (1965), the court, stressing that the distinction between the systems had been obfuscated by the *Roth* court and others, found "it clear that the Legislature . . . [had] intended the word 'accident,' in *N.J.S.A.* 43:15A–43, to comprehend an identifiable accidental incident, or a mishap, or a series of such untoward events, as contrasted with a gradual deterioration. . . ." In *McGee v. Board of Trustees, PERS,* 45 *N.J.* 576, 578–579 (1965), this Court, in applying the accidental disability provision of the PERS act, held that no accidental disability pension could be granted with respect to a heart attack superimposed upon an arteriosclerotic heart condition or disease because such an occurrence was not an "accident arising out of and in the course of [claimant's] employment."

In 1966 the accidental disability provisions of the PERS statute were amended and changed fundamentally. The amendment deleted the terminology that the disability simply be a "result" of injuries from an employment "accident," substituting instead the current requirements that the disability, total and permanent in nature, constitute the "direct result," not of an accident, but rather of a "traumatic event" which itself must "occur[ ] during and as a result of the performance of [the

employee's] regular or assigned duties . . . ." *L.*1966, *c.* 67, § 4. Additionally, the 1966 amendment provided for the further exclusionary or limiting qualification that a disability "resulting" from a certain "condition," *viz.*, "cardiovascular, pulmonary or musculo-skeletal," that is not itself a "direct result" of such a "traumatic event," does not constitute an "accidental" disability. *Ibid.* This concerted legislative effort to effect a basic change in the standards for awarding accidental disability retirement pensions is underscored by the identical amendments enacted with respect to the accidental disability pensions provided in other major state pension systems, *e. g., L.*1964, *c.* 241, § 4 and *L.*1967, *c.* 250, § 7 (revising *N.J.S.A.* 43:16A–7) (Police & Firemen's Retirement System (PFRS)); *L.*1966, *c.* 66, § 2 (revising *N.J.S.A.* 18:13–112.41) and *L.*1967, *c.* 271, subtitle 10, chapter 66, § 39(c) (replacing Title 18 with Title 18A) (*N.J.S.A.* 18A:66–39) (Teachers' Pension and Annuity Fund (TPAF)).

Our courts, in analyzing and interpreting the "direct result" and "traumatic event" language brought into the pension statutes, have concluded that the Legislature, by these amendments, had "intended to make the granting of an accidental disability pension more difficult." *Cattani v. Board of Trustees, PFRS, supra,* 69 *N.J.* at 584; see *In re Hill,* 160 *N.J.Super.* 382, 389–390 (App.Div.1978) (PFRS); *Hillman v. Board of Trustees, PERS,* 109 *N.J.Super.* 449, 459–460 (App.Div. 1970); see also Survey, "The 1975–1976 New Jersey Supreme Court Term—Survey of Workers' Compensation," 30 *Rutgers L.Rev.* 803, 805–806 (1977) [hereinafter cited as "Survey"]. Evidence of this intent was clear in the replacement of the term "accident" with "traumatic event," and the addition of the exclusionary limitation with respect to a "cardiovascular, pulmonary or musculo-skeletal condition." See *Russo v. Teachers' Pension and Annuity Fund,* 62 *N.J.* 142, 151 (1973); *Titman v. Board of Trustees, TPAF,* 107 *N.J.Super.* 244, 246 (App.Div. 1969). These amendments were also designed to distinguish the application of the pension retirement systems from the workers' compensation field and to repudiate reliance upon workers' compensation standards. See, *e. g., Russo v. TPAF, supra,* 62

*N.J.* at 146, 148, 150–151; *Hillman v. Board of Trustees, PERS, supra,* 109 *N.J.Super.* at 455, 460; *Titman v. Board of Trustees, TPAF, supra,* 107 *N.J.Super.* at 246; see also *Lyons v. State,* 153 *N.J.Super.* 396, 398 (App.Div.1977) (discussing liberal construction and administration of pension statutes). *Cf. McGee v. Board of Trustee, PERS, supra,* 45 *N.J.* at 579 (a preamendment case questioning, but not deciding, applicability of workers' compensation principles to pension system provisions).

It was recognized that a preexisting condition or disease in combination with other employment-related factors might not constitute an "accidental disability" for pension retirement purposes even though such a disability might satisfy workers' compensation requirements. The *Hillman* court stated: that "[t]he 1966 amendment was intended to avoid this [workers' compensation] result by introducing a new term, 'traumatic event.' Thereafter a pension would be available to those with a preexisting disease only where an unusual or excessive effort aggravated or accelerated that disease." 109 *N.J.Super.* at 460. See *Skulski v. Nolan,* 68 *N.J.* 179, 207 (1975); *Russo v. TPAF, supra,* 62 *N.J.* at 145–146; but *cf. In re Hill, supra,* 160 *N.J.Super.* at 392; *Murphy v. Division of Pensions,* 117 *N.J.Super.* 206, 213 (App.Div.1971).

While the PERS statute provides a rather elaborate definition of "accidental disability," courts have struggled with the proper meaning and application of the key terms "traumatic event" and "direct result." The *Hillman* court essayed a definition of "traumatic event":

> Dictionary definitions of "trauma" are readily available, but of little help. In determining whether there truly was a traumatic event it is important that (a) the event be identifiable as to time and place, (b) the injury or disability resulted directly from it, and (c) the event was undesigned, unexpected and unusual. [109 *N.J.Super.* at 460–461.]

See "Survey," *supra,* 30 *Rutgers L.Rev.* at 804.

In *Cattani v. Board of Trustees, PFRS, supra,* this Court noted the *Hillman* three-part "traumatic event" test and, although acknowledging application of the test in *Conklin v. Board of Trustees, PFRS,* 135 *N.J.Super.* 131 (App.Div.1975), rev'd on other grounds *sub nom. Conklin v. East Orange,* 73 *N.J.*

198 (1977), and *Shea v. Board of Trustees, PFRS,* 116 *N.J.Super.* 348 (App.Div.1971), concluded "that the third prong of the *Hillman* test is too broad and frustrates the restriction which the Legislature intended to place on the granting of an accidental disability pension when it substituted the expression 'traumatic event' for the word 'accident.'" 69 *N.J.* at 585. See "Survey," *supra,* 30 *Rutgers L.Rev.* at 804–805. Accordingly, the Court stated that a "traumatic event" would ordinarily entail a traumatic injury suffered as a result of an external force or violence but might also "be found in some situations [having a "traumatic origin"] which do not literally fall within the external force or violence concept . . . ." 69 *N.J.* at 586. *Cf. In re Iannelli,* 157 *N.J.Super.* 324, 335 (App.Div.1978), certif. den. 77 *N.J.* 488 (1978) (accidental death benefits under PFRS) (exposure of a fireman fighting a fire to toxic smoke, fumes, or gases satisfied the requirement of a traumatic event even though he had apparently suffered from preexisting heart disease and had died of a heart attack).

Judicial treatment of the statutory concept "direct result" and its relationship to the term "traumatic event" has been somewhat inconsistent and uncertain. This can be seen especially in cases where, as here, the disability may be causally related in some measure to an antecedent or underlying physical condition as well as to the traumatic event. Compare *In re Hill, supra,* 160 *N.J.Super.* at 390–392 and *Magnani v. Board of Trustees, PERS,* 142 *N.J.Super.* 262, 267 (App.Div.1976), with *Still v. Board of Trustees, PERS,* 144 *N.J.Super.* 103, 107 (App.Div. 1976), certif. den. 73 *N.J.* 46 (1977), and *In re Sigafoos,* 143 *N.J.Super.* 469, 473 (App.Div.1976), certif. den. *sub nom. Sigafoos v. Board of Trustees, PFRS,* 72 *N.J.* 458, 371 *A.2d* 62 (1976).

■ There would seem to be little question that the Legislature by the 1966 amendment of the accidental disability provisions, in its requirement that a disability be the "direct result" of the employment-related traumatic event, endeavored to impose a more exacting standard of medical causation. As we observed in *Russo v. TPAF, supra,* 62 *N.J.* at 150–151 the 1966 "amendment was found [in *Hillman*] to reject the [workers'

compensation] concept of *Ciuba* [*v. Irvington Varnish & Insulator Co.*, 27 *N.J.* 127, 134–135 (1958),] and *Dwyer* [*v. Ford Motor Co.*, 36 *N.J.* 487, 491 [(1962),] that an 'accident' can be found in the impact of ordinary work effort upon a progressive disease . . . .." Moreover, the statute expressly provides that disability resulting from a musculo-skeletal condition, as well as certain others, which was not a direct result of a traumatic event "shall be deemed an ordinary disability." Where there exists an underlying condition such as osteoarthritis which itself has not been directly caused, but is only aggravated or ignited, by the trauma, then the resulting disability is, in statutory parlance, "ordinary" rather than "accidental" and gives rise to "ordinary" pension benefits. Hence, in terms of a traumatic event equating with a statutorily sufficient medical cause of an "accidental" disability, what is now required by *N.J.S.A.* 43:15A–43 is a traumatic event that constitutes the essential significant or the substantial contributing cause of the resultant disability.

This understanding of the basic thrust of *N.J.S.A.* 43:15A–43 as embracing a more stringent test of medical causation was grasped in *Titman v. Board of Trustees, TPAF, supra,* where the court concluded that in that case there was sufficient credible evidence in the record to support the Board's decision that appellant's permanent and total disability was not the "direct result" of any incident at work, but of a degenerative process in her leg. The court stated:

> The word "direct" connotes relative freedom from remoteness, whether in terms of time, intervention of other contributive causes or the like, or a combination of such factors. . . . The express statutory exclusion of disability resulting from a "muscular-skeletal [*sic*] condition," not the direct result of a traumatic event, etc., reflects the legislative view that such conditions are particularly to be scrutinized for directness of connection between the specified traumatic event and the claimant's total disability. [107 *N.J.Super.* at 247 (emphasis added).]

*Cf. Hillman v. Board of Trustees, PERS, supra,* 109 *N.J.Super.* at 461; *In re Hill, supra,* 160 *N.J.Super.* at 389–390.

▬ In finding sufficient medical causation in this case, the court below was obviously influenced by our observations in *Cattani* that "a basis for an accidental disability pension would

exist if it were shown that the disability directly resulted from the combined effect of a traumatic event and a preexisting disease." 69 *N.J.* at 586. See also "Survey," *supra*, 30 *Rutgers L.Rev.* at 805. This observation was intended simply to underscore the point that an accidental disability in some circumstances may arise even though an employee is afflicted with an underlying physical disease bearing causally upon the resulting disability. In such cases, the traumatic event need not be the *sole* or *exclusive* cause of the disability. As long as the traumatic event is the direct cause, *i. e.*, the essential significant or substantial contributing cause of the disability, it is sufficient to satisfy the statutory standard of an accidental disability even though it acts in combination with an underlying physical disease.

The Court in *Cattani* in no way relaxed or modified the test to be employed to determine directness of causation in accidental disability cases. Indeed, in affirming the denial to the claimant of accidental disability benefits, we there held that the statutory requirement that there be an event with a traumatic origin did not apply to Cattani himself since his disability was clearly the direct result of a preexisting cardiovascular condition (basilar arterial occlusion) and not the result of work effort alone. 69 *N.J.* at 586–587. We did not there consider the question of medical causation, finding it "unnecessary to consider whether [Cattani's] disability was 'a direct result' of the alleged traumatic event." *Ibid.* In this regard, the Court pointedly observed that

> [t]he present provision that it must be shown that the person "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties" *means much more* than disability resulting from the aggravation or acceleration of a preexisting disease even though unusual or excessive work effort is involved. [69 *N.J.* at 585 (emphasis added).]

*Cf. In re Iannelli, supra,* 157 *N.J.Super.* at 335 (resulting fatal heart attack was a direct result of a traumatic event though combined with a preexisting heart condition where "[t]here was a gaseous assault upon [the employee's] heart and lungs with physical consequences so severe as to cause his death without

the impetus of any preexisting condition"). In terms of medical causation or etiology, the supplemental factor, or the "much more" referred to in *Cattani*, that is required in addition to the aggravation or acceleration of an underlying, preexisting condition is an event of a traumatic nature originating from the employment which event constitutes the essential significant or substantial contributing cause of the ultimate disability.

## III

The facts in this case must be reassessed in light of these principles. As noted, the evidence indicates that Gerba was struck in 1964 by both a truck and falling pallets and subsequently, in 1973, he fell and struck his back against a parked truck. There is really no dispute that each of those incidents did involve the infliction of some external force upon respondent's body and did in fact constitute a "traumatic event" within the meaning of *N.J.S.A.* 43:15A–43. *Cattani v. Board of Trustees, PFRS, supra,* 69 *N.J.* at 586; *cf. Toma v. Police & Firemen's Retirement System,* 172 *N.J.Super.* 76, 83–85 (App.Div.1980) (separate, cumulative work-connected physical injuries may constitute "traumatic events").

The Appellate Division in this case believed that respondent had sustained an accidental disability because it resulted directly from his traumatic injuries in conjunction with his preexisting arthritic condition. In so concluding, the court erred for the simple reason that the evidence of record would not support the conclusion that the traumatic injuries suffered by respondent directly caused his ultimate disability, either alone or in conjunction with his underlying, preexisting arthritic condition.

To reiterate the pertinent facts, respondent injured his back in 1964 and was out of work for approximately one month. After returning to active employment, he again sustained injury to his back in May 1973 when he slipped on oil and fell against a truck; but he missed no time from work due to this latter incident. Gerba was told by his treating physician that he had cervical and lumbosacral arthritis. Furthermore, Dr. William Kruger, certified by the American Board of Orthopedic Surgery, testi-

fied that respondent's physical condition was the direct result of the development of that arthritis in his neck and lower back, not of the incidents in 1964 and May of 1973, and that the traumas experienced on those occasions did not cause the arthritic condition. At most, Dr. Kruger indicated only that the traumatic event contributed to the progression of that condition presumably by aggravation, as Dr. LaPilusa stated. See *ante* at 179.

The Board quite obviously was aware of the somewhat variant medical opinions in the case. It was, no doubt, in the context of the issue of medical causation that the Board adopted the hearing examiner's conclusion that the traumatic events did not, for pension purposes, furnish the requisite degree of causation and, hence, that there was, under *N.J.S.A.* 43:15A–43, "no causal connection" between the traumas and the ultimate arthritic disability. The record discloses there was sufficient credible evidence to support the Board's determination that respondent's disability was not a "direct result" of a traumatic event as required by *N.J.S.A.* 43:15A–43. On judicial review of an administrative agency determination, courts have but a limited role to perform. *Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–580 (1980). Where, as here, the determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained. *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599 (1965). These standards of judicial review are fully applicable to these proceedings. *McGee v. Board of Trustees, PERS, supra*, 45 *N.J.* at 579; *Vliet v. Board of Trustees, PERS*, 156 *N.J.Super.* 83, 88 (App.Div.1978). The Appellate Division, reviewing these factual determinations and conclusions in light of the entire record, was thus constrained to affirm the administrative decision.

Accordingly, the judgment of the court below is reversed.

PASHMAN, J., dissenting.

Today the Court continues the unreasonably restrictive approach to disability pension benefits for public employees that it

adopted in *Cattani v. Board of Trustees, Police & Firemen's Retirement System*, 69 *N.J.* 578 (1976). In that case, the majority relied on the "fanciful distinction between the phrase 'traumatic event' and 'traumatic injury,'" *id.* at 595 (Pashman, J., dissenting), to deny recovery of disability benefits under *N.J.S.A.* 43:16A–7. In the present case, the majority has interpreted "direct result" under *N.J.S.A.* 43:15A–43 to require a "traumatic event" to be "the essential significant or substantial contributing cause of the disability," *ante* at 187. In practice this standard requires a traumatic event to be the *sole* cause—despite the majority's claim to the contrary, see *ante* at 187. Since "direct result" plainly refers to a direct cause and not a sole cause, the majority's standard is unwarranted. Furthermore, the majority has accepted findings of fact which are clearly erroneous and unsupported by the record. I respectfully dissent.

I

To reach its conclusion that claimant's disability was not the "direct result" of the traumatic events in 1964 and 1973 as required by *N.J.S.A.* 43:15A–43, the majority relies on the hearing officer's finding that there was no causal relationship between the two accidents and the disability. Such reliance is misplaced. Although it is true that courts have a limited role in reviewing the factual findings of an administrative agency, see, *e. g., Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–580 (1980), that review cannot be relegated to a mere rubber-stamp of agency action. The proper standard governing appellate intervention depends upon

> "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record," considering "the proofs as a whole," with due regard to the opportunity of the one who heard the witnesses to judge of their credibility * * * and, in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor. [*Close v. Kordulak Bros.*, 44 *N.J.* 589, 599 (1965) (quoting *State v. Johnson*, 42 *N.J.* 146, 162 (1964))]

See also *Mayflower Securities Co., Inc. v. Bureau of Securities*, 64 *N.J.* 85, 92–93 (1973); *Vliet v. Board of Trustees, PERS*, 156 *N.J.Super.* 83, 88 (App.Div.1978). In determining whether fac-

tual findings are clearly erroneous, a court should be guided by the following:

> While this feeling of "wrongness" is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous ways—from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, a clearly unjust result, and many others. [*State v. Johnson*, 42 *N.J.* at 162].

In the present case the hearing officer's finding that there was no causal connection between the disability and the accidents is clearly wrong. Not only is there a manifest lack of inherently credible evidence to support the finding, but it is equally clear that the hearing officer disregarded crucial evidence. Once it is determined on appeal that a "finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction * * * [an appellate court] should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions." *Id.* (citations omitted). Application of this analysis reveals that the result reached by the Appellate Division was correct.

In concluding that "the evidence of record [does] not support the conclusion that the traumatic injuries suffered by respondent directly caused his ultimate disability, either alone or in conjunction with his underlying, preexisting arthritic condition," *ante* at 188, the majority relies upon the following findings of the hearing examiner:

> The *uncontradicted* medical opinion is that Petitioner suffers from arthritis and that there is no causal connection between this illness and the two injuries he has suffered during his course of employment. Arthritis does not arise from a traumatic event involving a mishap or accident where there is an application of an external force to, or violent exposure of, the body. It is not the result of an external force or a violent exposure. [emphasis added]

This determination that the medical opinion was "uncontradicted" is clearly erroneous. Not only did the hearing officer overlook evidence to the contrary, but the very physician who testified at the hearing that there was no causal relation had submitted a contradictory prior report to the examiner.

At the hearing the only medical *testimony* presented was that of Dr. William Kruger. Dr. Kruger testified that Gerba's "continuing difficulty [was] due to arthritis in his neck and lower back," and that neither of his injuries contributed to the progression of the arthritis because "trauma does not cause or stimulate arthritic changes." See also *ante* at 179. But in the agency's disability evaluation report, which was admitted into evidence at the hearing, Dr. Kruger indicated that there was a "probable" causal connection between the injuries and the disability. The report further reads in relevant part:

There is no question that the episode of 1964 was an accident, but whether such a trauma contributed to severe osteoarthritis causing disability so many years later is very difficult to state. With respect to the fall in 1973, it appears that the initial injuries were not sufficient to cause him to to lose work, but he has been [sic] symptoms ever since. The Medical Board believes that the *injury to the shoulder and neck in 1964 probably at least contributed to the development of osteoarthritis, and we believe that the fall in 1973 added to the sum total of his difficulties.* Prior to that time led [sic] to increasing symptoms so that he finally became disabled in 1975. Therefore, we believe that the two episodes described, while not actually causing his disability, *contributed to the underlying condition or contributed to the symptoms produced by the underlying condition* and leading to his present state of being totally and permanently disabled. [emphasis added]

The accidents in 1964 and 1973 were described in the report as "contributing" or "adding" to the employee's underlying condition. The doctor's statement that the accidents did not "cause" the condition is at best professional advocacy and at worst sheer sophistry. In any event, the examiner's finding of "uncontradicted" evidence is unsupportable.

Gerba was not represented by counsel at his hearing. As a result, there was no cross-examination of Dr. Kruger, and his prior report was not explored during the hearing. However, the report was introduced into evidence and this constitutes part of the record on appeal. Viewing Dr. Kruger's testimony and his written report together, it is clear that there was a definite causal connection between Gerba's disability and his two accidents. Because the only medical evidence which supports the hearing officer's finding of no causal relation is the self-contradictory testimony of Dr. Kruger, that finding patently is not supported by "sufficient credible evidence."

Further evidence in the record indicates another conflicting medical opinion. The report of Dr. LaPilusa, which was also admitted into evidence at the hearing, replied "yes" to the question on the agency's form which asked whether the petitioner was disabled as a direct result of a traumatic event. Dr. LaPilusa explained that "[t]he trauma in 1964 can be an aggravating factor in his present condition." Again, it is manifest that by definition an "aggravating factor" can produce as a "direct result" permanent and total disability.

It should be noted that in the hearing officer's report, which found no causal relationship between the disability and the traumatic events, no mention was made of the "combined-effect" standard of *Cattani*, see 69 *N.J.* at 586, discussed *infra* at 194. It is likely that the hearing officer overlooked the evidence demonstrating a clear causal relationship between the accidents and the disability because he did not appreciate the relevance of contributing factors under the "combined-effect" test.

In the name of judicial deference, the majority has sanctioned an abuse of an agency's adjudicatory powers. By rejecting agency decisions that are arbitrary, capricious or unreasonable, or that lack support in sufficient credible evidence, a reviewing court places the only limits on administrative discretion short of drastic legislative intervention. This function of the judiciary in the formation of administrative policy is as important as it is well-settled. It is a function that the majority has failed to perform in this case. An agency decision which describes medical evidence rife with inconsistencies as "uncontradicted" is an arbitrary and capricious decision. The majority chooses to ignore this; as a result, an agency may now in turn ignore inconvenient conflicts in evidence without fear of reversal. I cannot subscribe to such an unwholesome development in the administrative law of this State.

The conclusion is inescapable that the hearing officer's finding as to causation "is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction * * *." *State v. Johnson*, 42 *N.J.* at 162. Based

on the foregoing examination of the record, I find that there clearly was a causal connection between the traumatic events and claimant's disability.

## II

I also conclude that Gerba's disability was the "direct result" of the two traumatic events which he suffered. This follows from the Court's decision in *Cattani*. Although declining to discuss whether the disability at issue in that case was a direct result of the alleged traumatic event, the Court stated the following:

> [A] basis for an accidental disability pension would exist if it were shown that the disability *directly resulted from the combined effect of a traumatic event and a preexisting disease*. [69 *N.J.* at 586 (emphasis added)]

The meaning of this *dictum* was explored in *In re Sigafoos*, 143 *N.J. Super.* 469 (App.Div.1976), certif. den., 72 *N.J.* 458 (1976). In that case the claimant suffered from a preexisting "back condition" when he twisted his back necessitating medical treatment and hospitalization and resulting in disability. The court noted that the preponderant medical evidence was that the traumatic event aggravated the claimant's condition. *Id.* at 473. In finding that the claimant's "disability 'directly resulted from the combined effect of a traumatic event and a preexisting disease,'" *id.* at 474 (quoting *Cattani*, 69 *N.J.* at 586, the court maintained:

> *Cattani* makes it clear that disability which is the end result of a prior musculo-skeletal condition may not be the basis of an accidental disability pension, even though the disability is aggravated or accelerated by work effort alone. That is not the case here. Nor is this case one where the end result, *i. e.*, the total and permanent disability, would have occurred when it did irrespective of the traumatic event. [143 *N.J.Super.* at 473]

In granting the benefits sought, the court also deemed it significant "that the Medical Board * * * listed as 'Probable' the 'cause and effect relationship of the described activity or incident to the present disability.'" *Id.* As mentioned above, it is equally significant that the Medical Board report listed the causal relationship as "Probable" in the present case.

The same logic was found persuasive in *Still v. Board of Trustees, PERS*, 144 *N.J.Super.* 103 (App.Div.1976), certif. den.,

73 *N.J.* 46 (1977). In that case, claimant injured his back in 1965, but suffered no symptoms of back pain until 1971 when he fell from a sweeping machine. Although experiencing pain and receiving medical treatment after his fall, he continued to work until 1973. At that time he became totally disabled. The medical testimony showed that the "claimant's disability was caused by a combination of the trauma and the [preexisting] osteoarthritic changes in the lumbar spine * * *." *Id.* at 107.

It is readily apparent that Gerba was disabled under the "combined-effect" standard expressed in *Cattani.* The Board's own physician stated that Gerba's "injury to the shoulder and neck in 1964 probably at least contributed to the development of osteoarthritis, and * * * that the fall in 1973 added to the sum total of his difficulties." He also opined that the two accidents "contributed to the underlying condition or contributed to the symptoms produced by the underlying condition * *." Thus, it is manifest that the two accidents and the osteoarthritis in the present case fall precisely within the meaning of the "combined-effect" standard as correctly interpreted by *Still* and *Sigafoos.*

The majority today, however, drastically narrows the meaning of the *Cattani* "combined-effect" test. To support its restrictive views on causation, it erroneously relies upon the following language from *Cattani* :

> The present provision that it must be shown that the person "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties" means much more than disability resulting from the aggravation or acceleration of a preexisting disease *even though unusual or excessive work effort is involved.* [69 *N.J.* at 585 (emphasis added)]

See *ante* at 187–188. This language does not suggest that the aggravation or acceleration of a preexisting condition directly resulting from a *traumatic event* fails to meet the statutory standards. Rather, it means only that "unusual or excessive work effort" cannot constitute a "traumatic event" even if that work effort directly results in the aggravation or acceleration of a preexisting disease. This observation relates solely to the first

element of the statutory standard—whether there is a "traumatic event." This is made evident by the additional explanation in *Cattani* that when combined with a traumatic event, a preexisting disease *can* form the basis for an accidental disability pension. *Id.* at 586, see *supra* at 180. Nonetheless, the Court asserts on the ostensible authority of *Cattani* that the traumatic event must be the "essential significant or substantial contributing cause of the disability," *ante* at 187. Without such a finding, a traumatic event will not supply the basis for accidental disability—even though it acts directly in combination with an underlying condition.

Such a severely restrictive definition of "direct result" requires the Court to be blind to the fact that the two accidents were indeed contributing factors in causing the claimant's disability. The Court's view also ignores the fact that prior to the second fall in 1973, the osteoarthritis was a relatively latent condition which the claimant could handle with little difficulty and no disability. The effect of trauma upon latent conditions was discussed in *Hillman v. Board of Trustees*, 109 *N.J.Super.* 449 (App.Div.1970)—a case repeatedly cited by the majority. There the court allowed recovery where a traumatic event aggravated a preexisting arteriosclerotic heart disease. In so holding, the court maintained:

> There can be no question that petitioner's present disability is a "direct result" of the traumatic event. As this court said in *Titman*, "the word 'direct' connotes relative freedom from remoteness, whether in terms of time, intervention of other attributive causes or the like, or a combination of such factors." 107 *N.J.Super.*, at 247. The heart attack made chronic what had previously been an asymptomatic condition. [109 *N.J.Super.* at 461]

Gerba's situation is not a case "where the end result, *i. e.*, the total and permanent disability, would have occurred when it did irrespective of the traumatic event." *Sigafoos*, 143 *N.J.Super.* at 473. I continue to adhere to my opinion in *Cattani*:

> [A]n unwillingness to recognize a previously unmanifested condition as the direct result of a traumatic event because of its preexisting potentiality to become symptomatic is as logically fallacious as designating life to be a terminal illness because death may be inevitable. [69 *N.J.* at 596 (Pashman, J., dissenting)].

The fact that Gerba continued to work as a security guard after his 1973 accident until September 1975 does not negate the

direct causal relationship between the latter traumatic event and his disability. The evidence demonstrates that until 1973, Gerba was able to cope with his condition fairly well. However, after his second accident he became increasingly less able to function. Although he worked for a time as a security guard, he was described as employed in a "sheltered environment on the basis of the sympathy of a benevolent employer." Thus, Gerba's continued employment does not detract from the fact that his earlier accidents caused a disabling aggravation of his dormant underlying condition. See *Still,* 144 *N.J.Super.* at 105–106.

### III

If the majority consistently accepts the agency's findings of fact, much of what it states in its decision is properly *dicta.* The hearing examiner's report, which the Division of Pensions adopted in its entirety, found "*no causal connection* between [petitioner's] illness and the two injuries he has suffered during his course of employment" (emphasis added). The majority affirms this finding as supported by sufficient credible evidence, see *ante* at 189. It thus becomes unnecessary to consider the type of causal relationship that would have permitted recovery of the higher disability pension. The rule that the majority formulates in this case emerges from a gratuitous, abstract discussion; the practical difficulties of its application are best illustrated by the majority's opinion in *Korelnia v. Board of Trustees, PERS,* 83 *N.J.* 163 (1980).

Relying on existing precedents, I conclude the evidence clearly shows that claimant's disability resulted from the "combined-effect" of his two work-related accidents and his preexisting osteoarthritis. It was therefore the "direct result" of a "traumatic event" as required by *N.J.S.A.* 43:15A–43. Even if claimant's two accident are perceived as mere aggravating factors, relief would nevertheless be warranted since the latter accident transformed a relatively latent condition into a crippling disability. Because the majority's disposition of this case unjustifiably deprives Joseph Gerba of benefits to which he is entitled, I

dissent and would affirm the judgment of the Appellate Division.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For affirmance*—Justice PASHMAN—1.