Affirmed in part; reversed in part; and remanded for further proceedings consistent with this opinion.

746 A.2d 492

JOHN W. MERNICK, RESPONDENT–APPELLANT, v. DIVISION OF MOTOR VEHICLES, PETITIONER–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted January 12, 2000—Decided February 28, 2000.

Before Judges KING, PAUL G. LEVY and CARCHMAN.

*Parsekian & Solomon,* attorneys for appellant, *(Melvin R. Solomon* and *Stephen Ward Smithson,* on the brief).

*John J. Farmer, Jr.,* Attorney General, attorney for respondent (*Mary C. Jacobson,* Assistant Attorney General, of counsel; *Scott E. Rekant,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

John Mernick appeals from the final order of the Director of the Division of Motor Vehicles (DMV) that indefinitely suspended his New Jersey bus driving endorsement because he suffers from chronic atrial fibrillation.[1] We conclude that the Director's order is invalid, because DMV has failed to consider the individual characteristics of Mernick's particular cardiovascular disease and has applied an administrative rule as a general standard that is not expressly authorized and cannot otherwise be inferred from its source in 49 *C.F.R.* § 391.41(b)(4). We remand for further consideration in accordance with this opinion.

In New Jersey, every bus driver must have a special license, sometimes known as a passenger-carrying endorsement to a commercial driver's license. Additionally, "[e]very holder of a special license ... shall furnish to the Director satisfactory evidence of continuing physical fitness, good character and experience at the time of application renewal or such other time as the Director may require, and in such form as the Director may require." *N.J.S.A.* 39:3–10.1. Regulations require all bus drivers to submit proof of continuing physical fitness every twenty-four months by providing a "satisfactory medical report submitted by a New Jersey licensed physician." *N.J.A.C.* 13:21–14.5(c)6. Moreover, the Director may revoke or suspend a bus driver's endorsement whenever an individual has "[f]ailed to meet the medical and physical qualifications set forth in the regulations of United States Department of Transportation, Bureau of Motor Carrier Safety, 49 *C.F.R.* 391.41,

---

[1] A condition where the upper chambers of the heart beat faster than normal and which can lead to adverse side effects explained *infra.*

effective January 1, 1971, and as thereafter amended." *N.J.A.C.* 13:21–14.5(c)11.

Those USDOT regulations state:

A person is physically qualified to drive a commercial motor vehicle if that person—

(4) Has no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure.

[49 *C.F.R.* § 91.41(b)(4).]

Mernick has a cardiac condition known as atrial fibrillation. The type of physical examination prescribed by the USDOT regulations for a bus driver with such a condition requires the examining physician to note "any past or present history of cardiovascular disease, of a variety known to be accompanied by syncope, dyspnea, collapse, enlarged heart, or congestive heart failure.[2]" An electrocardiogram is required when findings so indicate. *Ibid.*

When Mernick submitted the February 9, 1995 report of Shawn Crabtree, M.D. to DMV, the diagnosis of non-insulin diabetes apparently attracted attention and a "case" was generated, but it appears DMV took no action at this time.[3] The following year,

---

[2] The medical definitions of these terms are:

*Syncope:* A brief loss of consciousness caused by a sudden fall of blood pressure or failure of the cardiac systole, resulting in cerebral anemia.
*Dyspnea:* Difficulty in breathing often associated with lung or heart disease and resulting in shortness of breath.
*Collapse:* To break down suddenly in strength or health. The failure of a physical system.
*Congestive Cardiac Failure:* A condition marked by weakness, edema (accumulation of excessive amount of watery fluid in cells, tissues or serous cavities), and shortness of breath that is caused by the inability of the heart to maintain adequate blood circulation to the peripheral tissues and the lungs.
*Stedman's Medical Dictionary,* 26th Edition (1995).

[3] The state of the record is highly unsatisfactory, forcing us to infer certain procedures from the limited documentation provided. No copies of DMV action, such as a proposed notice of suspension or a notice for further examination have

Mernick submitted a report from Bruce T. Loughlin, D.O., dated August 19, 1996, indicating that Mernick had a history of cardio-vascular disease as well as diabetes, more specifically "noninsulin dependent diabetes, atrial fibrillation 8/20/96 controlled with medi-cation, normal angiogram 9/5/96." That was followed by another report from Dr. Loughlin dated September 7, 1996, acknowledging the USDOT regulation disqualifying a bus driver with a "current clinical diagnosis of ... cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse or congestive heart failure" and attesting, as an examining physician, that Mernick's bus driving privileges should be approved. The report of another examination on February 3, 1997 by a cardiologist, D.N. Das, M.D., recounted the results of an angiogram as normal and "[revealing] no evidence of coronary artery disease," inter-preted an EKG of the same date as indicating "atrial fibrillation with rate 92 BPM," and concluded that Dr. Das "believe[d] this patient is physically and medically able to drive a motor vehicle safely."

In 1996, Dr. Loughlin submitted the "attending physician's report on cardiovascular condition," a form supplied by DMV for submission to its Medical Fitness Review Unit. Using that same DMV form, on December 29, 1996, Dr. Loughlin observed atrial fibrillation at 80 beats per minute and concluded that Mernick was able to drive safely.

Obviously, both Dr. Das and Dr. Loughlin were of the opinion that Mernick's cardiovascular condition had not been accompanied by syncope or any of the other three listed symptoms. The attending physician's report that both doctors received, reviewed and completed, listed these conditions as disqualifying symptoms, and each doctor stated Mernick was qualified to drive a bus. By implication, the doctors must have found he did not suffer any of these disqualifying symptoms. DMV asked its Medical Advisory

been supplied. Neither brief references such information and oral argument was waived.

Panel of four cardiologists, none of whom appear to specialize in electrophysiology, to review these reports. Each of the four doctors on the panel recommended that DMV permit Mernick to retain his driver's license but suspend his passenger-carrying endorsement due to his atrial fibrillation. It is clear that each of these doctors was of the opinion that any bus driver diagnosed with atrial fibrillation, without consideration of its effect on the individual, must have his or her bus driver's endorsement revoked, automatically.

The Director issued an order on June 10, 1997, immediately removing Mernick's bus endorsement, but later stayed the order when Mernick requested a conference. At the conference in September, Mernick submitted a letter from Dr. Loughlin stating:

Mr. Mernick's atrial fibrillation is also under excellent control. He is presently taking Coumadin to prevent embolization and stroke and his prothrombin times have been consistently therapeutic. He has no symptoms from his left ventricular hypertrophy and is New York Heart Association Class 1.

The conference report noted the result of the earlier review by the Medical Advisory Panel concluding that Mernick was not qualified for a bus driver's endorsement "according to the regulation." After the conference, the matter was resubmitted to the Panel and each member reached the same automatic result. Dr. Bernstein opined that because Mernick had atrial fibrillation, he was "vulnerable to emboli. Therefore he should not be driving a bus." Dr. Danzig wrote that Mernick was "[a] fifty-three year old diabetic with chronic atrial fibrillation. His family internist feels he can drive a bus but even with his Coumadin therapy, he is still at risk for cerebral emboli and sudden paralysis or loss of consciousness. Must suspend bus." Dr. Braun concluded that Mernick had "uncontrolled AF'" and Dr. Kehler said that there was "long standing ... (At Fib.) which disqualifies for Bus."

On October 28, 1997, the Director again held Mernick was ineligible for the passenger-carrying endorsement on his commercial driver license, and effective November 12, 1997, he ordered the endorsement removed from Mernick's commercial driver's license indefinitely. Mernick immediately requested a conference,

and the order was stayed. Eventually, DMV referred the matter to the Office of Administrative Law as a contested case, and the stay was continued pending the outcome.

In October 1998, Mernick testified before an Administrative Law Judge (ALJ) that he has been employed as a bus driver since 1986, having previously been a tractor-trailer driver since 1962. He said he felt fine, takes his medication every day, and has never suffered any dizziness, chest pains, blurred vision or tiredness. He submitted two more letters from Dr. Loughlin reporting that the atrial fibrillation was "under excellent control" and opining that Mernick was "at minimal risk for cardiac collapse or syncope" and "qualified to drive a bus." Mernick also presented a report by David E. Cohen, a cardiologist who had examined him on September 17, 1998. It said:

> Mr. John Mernick was seen by me today in consultation. He is a 53 year old male with chronic atrial fibrillation and mild left ventricular dysfunction and non-insulin dependent diabetes mellitus. There is no history of any cardiovascular symptoms. He had a normal cardiac catheterization in 1996.
>
> The patient has chronic, asymptomatic, well-controlled atrial fibrillation and mild left ventricular dysfunction. He has no history of any cardiovascular symptoms. He is on Coumadin to prevent thromboembolic complications.
>
> There are no cardiac contraindications to his operating a commercial bus with passengers. I would fully support his effort to maintain that license. His current medical problems are under good control and there is no apparent risk for syncope or cardiac complications.

In a written opinion, the ALJ noted the history of the case and acknowledged the various medical reports in the record. He concluded that because "every doctor who has examined and/or reviewed the medical records has determined that Respondent suffers from chronic atrial fibrillation," Mernick has "a coronary (sic cardiac) condition that has been clinically diagnosed." The judge referred to Dr. Loughlin's note that Mernick was "at minimal risk for cardiac collapse or syncope" and to a report from panel member Dr. Danzig, given in another case,[4] describing the

---

[4] The name of that case is not revealed, but the content of the report states that the driver under consideration had "one sided paralysis and a seizure."

nature of atrial fibrillation. Dr. Danzig said that "[a]nticoagulant therapy helps reduce the incidence of these embolic strokes but does not eliminate them altogether. *Because of the above, all bus drivers with chronic atrial fibrillation or frequent episodes of atrial fibrillation are not physically qualified to drive a bus.*" (emphasis added). Apparently Dr. Danzig and the three other members of the DMV advisory panel were unaware that an electrophysiological test can determine whether a patient's atrial fibrillation can be controlled or can be converted back to a normal heart rhythm (sinus rhythm). Lindsay, Bruce D. and Smith, Joseph M., *Electrophisiologic Aspects of Human Atrial Fibrillation, Cardiology Clinics,* vol. 14, No. 4, 483, 493–95, November, 1996,

The judge also cited our opinion in *In the Matter of Oleksza,* 95 *N.J.A.R.*2d (MVH) 5 (App.Div.1995), for the proposition that "the pertinent federal regulation expressly provides that a person suffering from coronary insufficiency should not be licensed to operate a bus. 49 *C.F.R.* 391.41(b)(4)." But *Oleksza* involved a bus driver suffering from myocardial ischemia *and* atrial fibrillation, and our decision was based on the driver's coronary insufficiency due to ischemia; we did not consider the controllability of atrial fibrillation. Moreover, the record does not show that Oleksza's coronary insufficiency was controlled by medication. As we said:

> The application of this regulation does not turn on the degree of illness or whether a condition may be temporarily controlled by medications. Rather, it provides that persons with certain medical conditions, including coronary insufficiency, are automatically disqualified for licensure. In any event, the record provides adequate support for the conclusion that even with the "reasonable modifications" of medication and periodic physical examinations, appellant has a coronary insufficiency that makes him unable to meet one of the essential eligibility requirement for the operation of a bus.

> [95 *N.J.A.R.*2d (MVH) at 6.]

Oleksza's condition was diagnosed after he had submitted to two Thallium stress tests. The DMV's advisory medical panel recommended he be prohibited from operating a passenger bus, because the tests showed "evidence of coronary insufficiency (ischemia)

and he has atrial fibrillation." Oleksza's physician disagreed and thought the tests were inaccurate in that the evidence of ischemia was based on the Thallium remaining in his myocardial cells rather than coronary insufficiency. The Director accepted the panel's recommendation and denied Oleksza's application for a passenger endorsement. We affirmed, but *Oleksza* is clearly distinguishable from this case, because coronary insufficiency due to ischemia is not involved here.

49 *C.F.R.* § 391.41(b)(4) specifically disqualifies a person with one of four specific cardiac conditions, but places conditions such as atrial fibrillation into the general category of a "cardiovascular disease of a variety known to be accompanied by syncope [or] collapse." Here, we agree with the Director and the ALJ that Mernick suffered from atrial fibrillation and that some minimal risk of cardiac collapse, syncope or near-syncope (light headedness) was possible. However, neither the Director nor the ALJ considered whether Mernick's atrial fibrillation actually was "accompanied by syncope, dyspnea, collapse or congestive heart failure." None of these symptoms was reported by any of the examining physicians. We disagree that *any* risk of the ensuing symptoms of atrial fibrillation automatically disqualifies a driver from maintaining his passenger-carrying endorsement. There are two reasons for our disagreement: (1) Mernick's evidence of continuing physical fitness for a bus driving endorsement should have been evaluated subjectively with regard to his individual health status, preferably by an electrophysiologist; and (2) the manner in which DMV automatically disqualified Mernick solely because he was diagnosed with atrial fibrillation constitutes improper administrative rule making.

## I.

The official interpretations of the Federal Motor Carrier Safety Regulations (FMCSR), referring to 49 *C.F.R.* 391.41, state:

e. *Section 391.41(b)(4)Cardiovascular.* Whether an individual has a "current clinical diagnosis of" myocardial infarction, angina pectoris, coronary insufficiency,

thrombosis, or cardiovascular disease; and Whether the "current clinical diagnosis of ⁙ * " is of a variety known to be accompanied by "syncope, dyspnea, collapse, or congestive cardiac failure."

The term "has no current clinical diagnosis of" is specifically designed to encompass: "a clinical diagnosis of" (1) a current cardiovascular condition; and (2) a cardiovascular condition which has not fully stabilized regardless of the time limit. The term "known to be accompanied by" is defined to include: a "clinical diagnosis of" (1) a cardiovascular disease which is accompanied by symptoms of syncope, dyspnea, collapse, or congestive cardiac failure; and/or (2) a cardiovascular disease which is likely to cause syncope, dyspnea, collapse, or congestive cardiac failure.

It is the intent of the FMCSR to disqualify a driver who has a current cardiovascular disease which is accompanied by and/or likely to cause symptoms of syncope, dyspnea, collapse, or congestive cardiac failure, *but the subjective decision of whether the nature and severity of an individual's condition will likely cause symptoms of cardiac insufficiency is on an individual basis* and qualification rests with the medical examiner and the motor carrier. In those cases where there is an occurrence of cardiac insufficiency (myocardial infarction, thrombosis, etc.), it is suggested before a driver is certified that he have a normal resting and stress EKG, no residual complications, no physical limitations, and is taking no medication likely to interfere with safe driving.

Coronary artery bypass surgery is a remedial procedure and not a cardiovascular condition. Thus, while the operation itself does not disqualify the driver, the underlying condition which necessitated the operation may be disqualifying, but the final determination, as stated above, remains on an individual basis.

[42 *Fed.Reg.* 60,082 (1977) (emphasis added).]

Therefore the DMV should have considered the unique effect of the nature and severity of his condition. We reverse the Director's final decision because Mernick's "variety" of cardiovascular disease has not been proved to be "accompanied by" any of the four symptoms specified in the regulation.

Some medical authorities indicate there have been recent advances in treatment of atrial fibrillation which make it even more necessary to assess each case individually. Atrial fibrillation is the most common form of heart arrhythmia and affects more than two-million people a year. Prystowsky, E.N., *Perspectives and Controversies in Atrial Fibrillation,* 82 *Amer. Jour. of Cardiology,* (4A), 3I–8I, 3I (1998). This condition is evidenced when one or both atria, the upper chambers of the heart, quiver at faster-than-normal and/or erratic rates. *Stedman's Medical Dictionary,* 26th Edition (1995). Research has identified the main areas in the

heart where atrial fibrillation can occur, and this has provided far more effective modes of treatment which may be able to control or eliminate atrial fibrillation. Cox, J.L., Boineau, J.P. and Schussler, R.B., et al., *From Fishermen to Fibrillation: An Unbroken Line of Progress*, 56 *Annals of Thoracic Surgery* 1269–1273, 1269 (1994). The three main problems associated with atrial fibrillation all may have effective treatments which can control or eliminate any adverse effects associated with the condition. *Id.* at 1270. Lanoxin and Coumadin, both medications used by Mernick, may be effective at controlling the effects of atrial fibrillation. Singer, D.E., *Anticoagulation to Prevent Stroke in Atrial Fibrillation and its Implications for Managed Care*, 81 *Amer. Jour. of Cardiology*, (5A), 35C–40C, 37C (1998). Some research shows that once the underlying cause of this condition is identified, it can be treated properly and the arrhythmia frequently resolves, leading to a normal heartbeat and life. Cox, *supra*, 58 *Annals of Thoracic Surgery* at 1276.

Drs. Loughlin, Das and Cohen each believed Mernick's atrial fibrillation was under control and was not a basis on which to disqualify him from operating a bus. The opposing opinions came from each member of the Advisory Medical Panel, none of whom had either examined or treated Mernick and none could identify any incidents of syncope, dyspnea, collapse, or congestive cardiac failure. As a matter of credibility, "a criterion of recognized significance is the greater opportunity of a treating physician, as compared with a doctor who conducts a single examination in order to become an expert medical witness, to know, understand and decide upon the producing cause of the patient's condition." *See Bober v. Independent Plating Corp.*, 28 *N.J.* 160, 167, 145 *A.*2d 463 (1958). While a subjective evaluation necessarily impacts the credibility of the evidence, the presumably more credible opinions were practically ignored by the ALJ and the Director.[5] More-

---

[5] The ALJ stated that "[i]t is clear that there is an increased risk of emboli, syncope or collapse to persons with chronic atrial fibrillation.... Not only did

over, the opinions expressed by the panelists were not legally competent because each expressed the legal opinion that the applicable regulation required a person with atrial fibrillation to surrender his passenger-carrying endorsement. "Making legal conclusions is the province of the court and not the experts." *N.J. Sports and Exposition Authority v. Giant Realty Assoc.*, 143 *N.J.Super.* 338, 355, 362 *A.*2d 1312 (Law Div.1976).

Even though, in a footnote, the ALJ stated there was no persuasive evidence that Mernick was less of a risk of cardiac collapse or syncope than a person without atrial fibrillation, and he did not assume that Mernick took his medication as prescribed, there is no evidence to the contrary. Thus we reject those factual conclusions as lacking support in the record. Ordinarily we defer to the expertise of an administrative agency if "there is sufficient credible competent evidence in the record to support the agency head's conclusions." *Clowes v. Terminix International*, 109 *N.J.* 575, 586, 538 *A.*2d 794 (1988). However, we are not bound to uphold an agency determination if it is not supported by substantial, credible evidence. *Id.* at 587, 538 *A.*2d 794. Accordingly, we reject the factual determinations made by the Director.

## II.

The Director's decision is sustainable only if a person with atrial fibrillation is necessarily and automatically deemed unfit to drive a bus. Such agency action suggests the decision was based on an administrative rule rather than an administrative adjudication. Our Supreme Court held that "an agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process." *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 331, 478 *A.*2d 742 (1984).

---

Respondent fail to rebut that conclusion; his own witnesses, in fact, corroborated it."

The Court listed the features to be considered were whether the determination:

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group;

(2) is intended to be applied generally and uniformly to all similarly situated persons;

(3) is designed to operate only in future cases, that is, prospectively;

(4) prescribes a legal standard or directive not otherwise expressly provided by or clearly and obviously inferable from the enabling statute;

(5) reflects an administrative policy that:

(i) was not previously expressed in any official and explicit agency determination, adjudication or rule; or

(ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and

(6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[97 *N.J.* at 331–32, 478 *A.*2d 742.]

The decision to deny Mernick a passenger-carrying endorsement may well affect every bus driver whose proof of continued good health on renewal contains a current clinical diagnosis of some type of cardiovascular disease. The DMV's use of the 1995 letter opinion from Dr. Danzig shows an intention to apply the ruling in a general and uniform way to all bus drivers and also sets a legal standard contrary to the interpretation of the source rule in the FMCSR. Finally, the manner in which DMV uses the regulation reflects the agency's own interpretation of the FMCSR and expresses a general policy. We have no doubt that "the determination is intended to be a rule of unvarying application to all similar cases." *Metromedia, supra,* 97 *N.J.* at 334, 478 *A.*2d 742. Thus, in accordance with the *Metromedia* test, we conclude the Director's final decision here constitutes administrative rule-making and its use "required compliance with statutory rule-making procedures." *Ibid.* Otherwise, the DMV may continue to assess each application for the passenger-carrying endorsement to a commercial driver's license on its individual merits.

Reversed and remanded for reconsideration.