**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0596-17T2

ROBERT TORRES,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES, STATE
POLICE RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Argued December 18, 2018 – Decided March 18, 2019

Before Judges Fisher, Geiger and Firko.

On appeal from the Board of Trustees of the State Police Retirement System, SPRS No. 8-10-4478.

Elliott J. Almanza argued the cause for appellant (Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill, attorneys; Elliott J. Almanza, of counsel and on the briefs).

Christopher R. Meyer, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Christopher R. Meyer, on the brief).

PER CURIAM

Petitioner Robert Torres appeals from a final decision of respondent Board of Trustees (the Board) of the State Police Retirement System (SPRS), denying his application for accidental disability retirement benefits pursuant to N.J.S.A. 53:5A-10. We affirm.

I.

The Board does not dispute petitioner is permanently disabled from working as a State Trooper. The primary issue in this case is whether petitioner's disability is causally related to a motor vehicle accident while on duty or a degenerative pre-existing condition. We therefore begin with a discussion of petitioner's relevant athletic pursuits, employment history, and the physical demands of employment as a State Trooper generally and as a member of a K-9 unit specifically.

Petitioner entered the New Jersey State Police (NJSP) Academy in June 2004 and graduated from the physically demanding, twenty-six-week program in December 2004. After completing various assignments he was transferred to Atlantic City International Airport and applied to become a member of the K-9 unit. Petitioner was selected and enrolled in the K-9 patrol school course; a sixteen-week program involving rigorous physical training, including running,

jumping, tracking individuals, apprehending individuals, and carrying and handling the dogs. Petitioner graduated and was assigned to the K-9 unit. Following graduation from the K-9 academy, petitioner was required to maintain that level of physical fitness and participate in recertification on a monthly basis.

Petitioner played four years of varsity baseball in high school and four years of Division I baseball at Monmouth University. He also played summer baseball in a men's league after college. Petitioner worked in construction prior to becoming a State Trooper.

Petitioner contends he never had any problems with his back, left hip, or left leg prior to being injured in a February 20, 2010 motor vehicle accident (the accident) while on duty. On that date, petitioner was injured when he was struck by an intoxicated motorist while reentering his patrol car on the Atlantic City Expressway. The patrol car was parked on the shoulder with its emergency lights on. The drunk driver fled the scene and was apprehended later.

Petitioner contends the intoxicated motorist's vehicle made contact with both the left side of his body and the open driver's-side door of his troop car. As a result of the impact, the door sprang back in the opposite direction, striking petitioner on his left side.

A-0596-17T2

Shortly after the accident, petitioner was transported to the Emergency Department at Atlantic City Medical Center. His chief complaints involved the left side of his body, including his left arm, shoulder, back, knee, hip, and thigh area. Notably, petitioner did not suffer any fracture, dislocation, laceration, abdominal injury, chest injury, or head injury. He was treated with anti-inflammatory medications and sent home. However, within two days of the accident, petitioner saw a NJSP physician because of continued pain in his left shoulder, left hip, left knee, and lumbar spine. He was placed on temporary limited duty and prescribed anti-inflammatory medication.

Petitioner was thirty-four years old at the time of the accident. Following an investigation, the accident was deemed non-preventable, and petitioner was not at fault.

At the direction of the NJSP physician, petitioner was referred to Advantage Occupational Medicine. During his initial examination on February 23, 2010, petitioner described his lower back as his worst injury. Petitioner attended prescribed physical therapy for approximately four to six weeks. Petitioner was also continued on anti-inflammatory medication. Toward the conclusion of his physical therapy, petitioner continued to report "anterior thigh pain" and "pain within the left hip joint anterolaterally." Sheryl E. Timpanelli,

APN, believed petitioner was suffering from "an unusual, nonetheless late onset of sciatic distribution pain or lumbar neuropathy on the left side."

In early April 2010, Dr. Joseph Bernardini, an orthopedic surgeon, examined petitioner and reviewed a Magnetic Resonance Imaging (MRI) of petitioner's lumbar spine and an x-ray of his pelvis. Dr. Bernardini noted a negative straight leg raising test. He observed "early degeneration of the L4-L5 disc and a slight bulge" on the MRI. The x-ray of petitioner's pelvis showed "femoral head deformity and a dysplastic socket with moderately severe osteoarthritis" of the left hip. Dr. Bernardini diagnosed moderately severe left hip osteoarthritis and changed petitioner's medication.

Approximately six weeks after the accident, petitioner returned to full duty for over seven months. For the first five months, petitioner performed his duties with no impediments. In November 2010, he returned to Dr. Bernardini because of continued hip pain. Dr. Bernardini noted petitioner's left hip condition was "already existing" at the time of the accident and was "probably aggravated by the condition and demand of his work." An MRI performed at that time revealed "[a]dvanced left hip joint osteoarthritis, likely post-traumatic from remote trauma."

5

Petitioner's condition worsened and, for the first time in his career, he was unable to perform the annual physical testing for State Troopers. In July 2011, he requested approval for an alternate testing procedure using a stationary bike rather than running.

In December 2011, Dr. Bernardini opined petitioner's pre-existing osteoarthritis condition was aggravated by the accident, and his symptoms were progressively worsening. Physical examination and x-rays revealed progression of the arthritis and rapid deterioration of the left hip. Dr. Bernardini found the deformation of the hip and arthritic changes to the remaining articular cartilage had worsened since the last x-ray was taken six months earlier. Petitioner exhibited left leg shortening of about one inch and a stiffer range of motion.

With regard to whether the progression of the hip arthritis was causally related to the accident, Dr. Bernadini noted he was limited to the information on file and petitioner's self-reporting. After reiterating the "arthritis of the left hip is of a pre-existing nature," Dr. Bernardini stated it was "possible" the accident "is responsible for exacerbation of the condition, for his current complaints and his current findings." He was unable "to retrospectively sep[a]rate his previous condition and the role it has played on his present situation."

6

Petitioner obtained a second opinion from another orthopedic surgeon, Dr. John A. Cristini, in January 2012. Dr. Cristini determined petitioner's hip arthritis had reached "endstage condition" leaving "total hip replacement arthroplasty" as the only option. He opined petitioner:

> is totally disabled at this point and unable to participate and perform his expected duties as a State Trooper. The condition, in my opinion, is directly related to [the accident] in the form of aggravation of a pre-existing degenerative process with acceleration of the degenerative changes with progression of the changes manifest on x-rays, as well as MRI examination.
>
> . . . [T]he condition is permanent in nature, has been appreciably aggravated by the incident in question, and is therefore directly and causally related and the requirement for hip replacement arthroplasty, is directed related to [the accident].

Dr. Cristini also noted a negative straight leg raising test result and that the 2010 MRI "revealed some mild disc desiccation at the L4-5 level."

In late January 2012, petitioner saw Dr. Fabio Orozco, an orthopedic surgeon specializing in hip replacement surgery. Dr. Orozco performed a complete left hip replacement in March 2012. Following surgery, petitioner participated in rehabilitation and physical therapy. At first, Dr. Orozco reported petitioner's hip was "progressing really well" and he was "able to ambulate without assistance," with little to no hip discomfort. Dr. Orozco noted petitioner

7

was experiencing lower back discomfort to the point it affected his activities of daily living and ability to walk for long distances.

In May 2012, Dr. Orozco noted petitioner was recovering well and participating in physical therapy, but had "some remaining discomfort on his lower back area, minimal discomfort on his left hip. He is able to ambulate without assistance." Dr. Orozco recommended continued physical therapy and that petitioner remain out of work for an additional four weeks with follow-up to assess his progress.

The following month, Dr. Orozco noted petitioner "still has some discomfort especially lower back area pain, but minimal discomfort on his left hip." One month later, Dr. Orozco concluded petitioner had achieved "maximum medical improvement in regard to his left total hip arthroplasty," so he recommended proceeding with a functional capacity evaluation (FCE).

The FCE was terminated prematurely because petitioner could not run pain-free. The FCE report stated petitioner could return to work, however, "participating in active foot pursuits, or apprehending/restraining unruly subjects is not recommended." Dr. Orozco completed an NJSP Critical Tasks and Fitness Standards Form, attesting petitioner could not perform a substantial

number of duties associated with police work, and recommending limitations on his work be put in place.

Because the pain in his lower back and left leg was not improving, petitioner was again referred to Dr. Bernardini, who advised petitioner he had a degenerative lower back condition that he would have for the rest of his life.

Due to radiating pain he was still experiencing, petitioner was again referred to the Rothman Institute by the NJSP treating physician. Another MRI was performed in December 2012. The radiologist reported: "L4-5: Small posterior disk bulge. Mild disk desiccation. No significant canal stenosis. There is far lateral disk bulging on both sides with endplate spondylitic ridging. Far left lateral annular tear. Mild left-sided and right-sided foraminal narrowing."

Petitioner's last official day of work was December 19, 2011. One year later, petitioner applied to the Board for an accidental disability retirement. In his description of "all the factors contributing to [his] injury," petitioner stated: "The injuries sustained culminated in the complete degeneration of my left hip joint. This injury required a total hip replacement." Petitioner did not mention a lumbar injury.

The disability application included "Medical Examination by Personal or Treating Physician" forms submitted by Dr. Bernardini and Dr. Orozco, who indicated petitioner is "totally and permanently disabled and no longer able to perform his or her job duties and/or any other job" "as a direct result of an accident that occurred during the performance of the applicant's regular assigned duties." Dr. Bernardini stated a diagnosis of "osteoarthritis, left hip (degenerative joint disease) [status post] total joint arthroplasty." Dr. Orozco stated: "[degenerative joint disease – status post] left total hip arthroplasty." Dr. Orozco further noted: "Due to accident [petitioner] had hip pain, he slowly deteriorated and failed conservative treatments which ultimately led him to require a total hip replacement." Notably, neither Dr. Bernardini nor Dr. Orozco cited a lumbar spine condition as a disabling condition.

In June 2013, Dr. Jeffrey F. Lakin, a board certified orthopedic surgeon, performed an independent medical evaluation (IME) of petitioner. During the examination, petitioner told Dr. Lakin his hip pain had improved but he was still unable to run because of sharp pain in his left hip. Physical examination revealed petitioner's spine was not tender and had normal range of motion. He had a negative straight leg raising test result and did not exhibit pain radiating

into his legs. Dr. Lakin found petitioner's spinal examination was normal and he was neurologically intact.

Dr. Lakin opined petitioner "is totally and permanently disabled from his normal activities of his job as a State Trooper" as "a result of having osteoarthritis of the left hip which required a left total hip replacement." Dr. Lakin concluded petitioner's disability is not a direct result of the accident. He explained that petitioner's severe, advanced left hip osteoarthritis was "a significant preexistent condition" "likely posttraumatic from trauma." Dr. Lakin noted imaging studies revealed petitioner had advanced signs of degenerative arthritis of the left hip in 2010, including a "diminutive left superior acetabular labrum likely secondary to degeneration." Based on these findings, he concluded "the arthritis clearly was not caused from [the accident] but was a preexisting condition." He also noted "mild left sided and right sided foraminal narrowing" and "endplate spondylytic ridging" at L4-L5. Dr. Lakin found no objective medical evidence that the accident caused any lumbar disc condition.

On September 24, 2013, the Board determined petitioner is totally and permanently disabled from performance of his regular and assigned job duties or other duties that the Superintendent is willing to offer. The Board found the event causing the disability is identifiable as to time and place and that the event

causing his disability was undesigned and unexpected. The Board noted the event occurred during and as a result of petitioner's regular or assigned duties and was not the result of his willful negligence.

The Board further determined petitioner's disability is not the direct result of a traumatic event, caused by a circumstance external to petitioner, but rather "is the result of a pre-existing disease alone or a pre-existing disease that is aggravated or accelerated by the work effort."

The Board granted petitioner ordinary disability effective October 1, 2013, but denied his application for accidental disability retirement benefits. Petitioner appealed the Board's decision and the matter was transferred to the Office of Administrative Law (OAL) as a contested case.

While the OAL proceeding was in discovery, petitioner's workers' compensation case was closed. In May 2014, petitioner retained Dr. James G. Lowe, a spinal surgeon, to perform an IME. Dr. Lowe's report was used to reopen the workers' compensation case. His report notes that on the day of the accident, petitioner was diagnosed with multiple contusions, with noted complaints of low back pain. Dr. Lowe reported petitioner's "dominant symptomatology is back pain radiating into the left lateral proximal hip and buttock, and anterolaterally in the left leg to terminate at the knee."

12

Dr. Lowe noted the 2010 MRI shows "mild bulging at L4-5 with an annular tear posteriorly at the L4-5 level." The remaining discs appeared normal. He found "no signs of degenerative disease visible on this study." The 2012 MRI "shows some progression of similar findings at L4-5 with further loss of signal and increased bulging." An annular tear was also observed. The remaining discs appeared normal. Dr. Lowe did not find any degenerative or arthritic abnormalities.

Dr. Lowe diagnosed petitioner with "[m]echanical back pain with radiculopathic component and radiographic evidence of focal internal disc disruption, annular tearing, and disc bulging at L4-5. Clinically, the patient is suffering from probable lumbar discogenic syndrome." Dr. Lowe opined that petitioner's "current symptoms, findings, and need for treatment are related" to injuries sustained in the accident. He noted petitioner had no back symptoms or need for treatment for spinal problems prior to the accident, but has experienced "persistent and ongoing symptomatology" following the accident.

At the direction of the NJSP physician, petitioner was referred to Dr. Kristen E. Radcliff, a spinal surgeon. Dr. Radcliff first saw petitioner in early July 2014. After reviewing the 2010 and 2012 lumbar spine MRIs, Dr. Radcliff reported:

there is some disc desiccation with decreased T2 signal intensity in the L4-L5 level on both MRIs. It appears to have progressed from the 2010 to the 2012 MRI. There is a protrusion at the L4-L5 level that appears to have also progressed and some loss of disc height that also appears to be progressive from 2010 to 2012 MRI. There is no evidence of any degenerative changes, loss of disc height, and loss of disc fluid at [the other levels] on either study.

ASSESSMENT: Lumbar disc herniation with accelerated degenerative disc disease at L4-L5 with axial pain dominant symptoms, although he does have some left lower extremity radiculopathy symptoms that are not as severe as the back pain.

Dr. Radcliff opined that the L4-L5 disc injury is a direct result of the accident. He found no evidence it is a preexisting condition due to petitioner's age, lack of symptoms prior to the accident, and because his other discs appear normal. He found no reason to suspect "early genetic predisposition to degenerative disc disease that would have rendered that disc degenerative."

Dr. Radcliff's subsequent report, which followed a July 2014 lumbar spine MRI, diagnosed petitioner with a disc herniation at L4-L5 and degenerative disc disease at L4-L5 with back and leg pain causally related to the accident that the patient sustained. Dr. Radcliff found "a clear progression at the L4-L5 level" compared to the initial studies from 2010. "The other levels actually appear to be unchanged." Dr. Radcliff concluded petitioner "is not simply predisposed"

14

to develop a degenerative disease because if he was it would be present "throughout his entire spine." Instead, "there was likely a focal event at the L4-L5 level that caused him to degenerate."

One year later, Dr. Radcliff issued a report in which he opined petitioner's "left leg symptoms . . . represent an L4 radiculopathy secondary to a far lateral disc herniation on the left side at L4-L5." He noted the left L4-L5 far lateral disc herniation was present on the 2010, 2012, and 2014 MRI studies but had "progressively increased in size" from 2012 to 2014. Dr. Radcliff further opined "[t]he far lateral disc herniation at L4-L5 is a direct causal result" of the accident. He noted petitioner "does not have evidence of early degenerative disc disease to explain the occurrence of the disc herniation. Changes in the underlying bones at [L1-L2], [L2-L3], [L3-L4], or [L5-S1], consistent with degenerative disc disease unrelated to the trauma, are absent." The report further states: "If he had not been involved in the accident . . . he would not have had this acute left lower extremity radiculopathy. The left L4 radiculopathy is separate and distinct from his intrinsic hip pathology." Dr. Radcliff determined "[t]he prognosis for full recovery even with a surgical decompression is poor." He considered petitioner to be "at maximal medical improvement even with surgical interventions."

15

In June 2015, Dr. Radcliff convinced the radiologist who interpreted the 2010 and 2014 lumbar MRIs, to issue an additional finding to the 2014 MRI report of "a very small foraminal disc protrusion which effaces the foraminal fat adjacent to the ganglion" that "was not seen" in the 2010 MRI.

The matter was assigned to an administrative law judge (ALJ) who conducted a three-day hearing. Petitioner, Dr. Radcliff, and Dr. Lakin testified. Sixty-nine exhibits were admitted into evidence.

Petitioner testified his chief complaint immediately following the accident was lower back pain. He testified he suffered no prior injuries to his back or spine. Petitioner was medically cleared to return to full duty by Dr. Orozco and the NJSP physician after the accident. Upon his return to full duty as a K-9 officer he was able to work with no impediments for several months. He then noticed his hip was not "feeling good" and "was worsening." Petitioner continued to experience lower back pain and numbness, as well as stinging and tingling sensations down his left leg after the physical therapy ended. On Dr. Radcliff's recommendation, petitioner received epidural injections in August and September 2014. The first injection gave him significant pain relief. Although he could have had a third epidural injection, he did not do so.

Petitioner did not testify regarding the frequency, duration, or intensity of his lower back pain. Nor did he testify as to his ability to perform physically with respect to his hip. He did state he cannot run or do high impact exercises like jumping, tumbling, or subduing a suspect because he "would not feel comfortable" with his lower back pain. Petitioner testified Dr. Bernardini told him his lower back condition was degenerative and permanent.

During cross-examination, petitioner testified he was involved in a motor vehicle accident in 1992 when the car he was in was hit by a tractor trailer. He was asleep when the car was struck and had no recollection of the accident.

Around the year 2000, petitioner was in a car that was rear-ended by another vehicle in Philadelphia. He claims he was uninjured and received no medical treatment.

While stationed at the Bridgeton State Police barracks in 2006, petitioner was struck by a car while attempting to stop a fleeing robber. Petitioner said he bounced off the front of the car and kept running. He was taken to the Emergency Room and given anti-inflammatories.

Petitioner stated he no longer has any hip pain. He first said all his pain is now from his back, but later stated he also experiences pain, numbness, and tingling radiating down the left side of his leg. He currently takes Motrin and

A-0596-17T2

Tramadol for pain and does home exercises, including upper raises, lower back lifts, leg work, and bridge exercises.

Dr. Radcliff's testimony tracked his reports. He reiterated his diagnosis of an "L4 radiculopathy secondary to an L4-5 disc herniation." Dr. Radcliff opined petitioner's "symptoms were related to the spinal diagnosis" because the anatomical location of the symptoms coincided with the nerve that was displaced by the disc herniation. He also found the "white spot" in the L4-L5 disc space on the MRIs suggested "acute edema." Dr. Radcliff characterized the disc condition as a focal problem related to the accident given the acuity shown in the 2010 MRI.

Dr. Radcliff testified the far lateral L4-L5 herniation appeared in the 2010, 2012, and 2014 MRIs. In his opinion, petitioner was misdiagnosed because a far lateral L4-L5 herniation is a "rare finding" that is "very hard to see" and "easy to miss." Dr. Radcliff believed Dr. Lakin, who was a general orthopedic surgeon, may have lacked the specialized knowledge required to properly identify and diagnose petitioner's lumbar injury.

Dr. Radcliff testified the surgery to correct the far left lateral disc herniation is technically challenging with a high chance of complications and has a poor prognosis even with a successful outcome. He opined petitioner

would be unable to return back to work as a State Trooper even if the surgery were successful. Dr. Radcliff did not recommend petitioner undergo spinal surgery and petitioner elected not to.

Dr. Radcliff described petitioner's disc herniation and radiculopathy as causing petitioner to suffer lower back and left leg pain and some subjective muscle weakness. He observed no muscle atrophy or wasting. He further opined that without surgery, there is a potential for episodic flare-ups that would prevent petitioner's return to work as a State Trooper. Dr. Radcliff did not offer an opinion regarding the expected frequency, duration, or severity of such flare-ups or the severity of petitioner's pain when not experiencing a flare-up.

During cross-examination, Dr. Radcliff acknowledged petitioner's hip condition did not start with the accident. It predated the accident and the joint was deteriorating before the accident. Dr. Radcliff also acknowledged the hip replacement was successful but stated he is not a hip specialist and does not perform hip replacement surgery.

Ultimately, Dr. Radcliff concluded "absent the hip problem [petitioner] still would be disabled because of having had a disc herniation that's been . . . untreated for five years in a bad location where it's hard to treat. So I think that the spine also is an independent reason that he would be permanently disabled."

A-0596-17T2

Dr. Lakin's testimony revealed he is not a board-certified spinal surgeon and no longer performs spinal surgery. On direct examination, Dr. Lakin insisted that any impingement on the L4 nerve would not cause radiculopathy in the anterior thigh, explaining that a far lateral herniation at the L4-L5 level impinging on the L4 nerve would be felt below the knee in the interior aspect of the leg, such as the shin and calf. After being shown two authoritative texts during cross-examination, Dr. Lakin admitted that a far lateral L4-L5 herniation could cause symptoms above the knee.

In all other respects, Dr. Lakin's testimony tracked his report except for his testimony that petitioner's thigh pain resulted from the surgeon utilizing a rectus femoris muscle approach during the total hip replacement.

The ALJ issued a July 30, 2017 written initial decision affirming the Board's determination that petitioner is not eligible for accidental disability retirement benefits and dismissing his appeal. The ALJ made the following findings:

> With regard to the cause of petitioner's injuries and disability, Dr. Radcliff presented credible detailed and sincere testimony regarding his observation of petitioner. He presented clear understanding of his field and took great care to explain and demonstrate the concepts and methods he was describing. Dr. Lakin offered similarly clear, concise yet detailed testimony and similarly demonstrated impressive knowledge in

20

the area.  On balance, I was better persuaded by, and give greater weight to, the testimony of Dr. Lakin on this issue, specifically crediting his detailed tying of petitioner's conditions and injuries to specific incidents, treatments, and notations in petitioner's medical history.  This includes his conclusion that petitioner's disability was not caused by [the accident].  Conversely, Dr. Radcliff's conclusion that petitioner's disability was caused by the accident, was not as similarly detailed in its analysis and seemed to be more rooted in his observation that petitioner was always able to return to work after previous injuries and treatments, and that he was only not able to do so after the event at-issue in this proceeding.  Dr. Radcliff's opinion that [petitioner] has an independent disability based on the condition of his [L4-L5] disc is not supported by his two other treating physicians (Dr. Bernardini and Dr. Orozco) nor is it supported by the radiologist who prepared an MRI addendum at Dr. Radcliff's suggestion.  The addendum to the 2014 MRI of [petitioner's] lumbar spine noted only a small disc protrusion of the [L4-L5] disc that effaced the fat adjacent to the ganglion, without neural constriction.  Dr. Lakin's opinion, on the other hand, coincides with Dr. Bernardini and Dr. Orozco, both of whom did not diagnose a lumbar condition when they were treating [petitioner].

    Accordingly, I FIND that petitioner's disability is the result of pre-existing medical conditions that were aggravated by [the accident].

Based on his findings, the ALJ engaged in the following analysis:

    the credible expert testimony of Dr. Lakin establishes that [petitioner's] disability resulted solely from an exacerbation of a significant pre-existing condition, i.e., arthritis, resulting in a total left hip replacement.

21

> While [the accident] may have aggravated or accelerated these conditions, the accident was not the essential significant or substantial contributing cause of petitioner's inability to perform his regular and assigned duties.

The ALJ determined petitioner's disability was not a direct result of the accident; therefore, he was not eligible for accidental disability retirement benefits.

Petitioner filed exceptions to the initial decision. On September 26, 2017, the Board adopted the ALJ's recommendations. This appeal followed.

Petitioner raises the following points: (1) the decisions of the ALJ and the Board are not supported by adequate, substantial, credible evidence in the record; (2) the ALJ does not have unconstrained discretion in making credibility determinations; (3) the ALJ and the Board's reasons for crediting the testimony of Dr. Lakin and discrediting the testimony of Dr. Radcliff lack support in the record; and (4) the Board erred as a matter of law. Petitioner contends there is no evidence in the record that petitioner was ever impeded physically from performing his duties as a State Trooper or K-9 officer prior to the accident.

## II.

We begin with basic principles. "Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Fireman's Ret. Sys., 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). "We recognize

that agencies have 'expertise and superior knowledge . . . in their specialized fields.'" Hemsey v. Bd. of Trs., Police & Fireman's Ret. Sys., 198 N.J. 215, 223 (2009) (alteration in original) (quoting In re License Issued to Zahl, 186 N.J. 341, 353 (2006)). Reviewing courts presume the validity of the "administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). A "strong presumption of reasonableness attaches" to the agency's decision. In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993), aff'd, 135 N.J. 306 (1994)). The factual "findings of an ALJ 'are considered binding on appeal, when supported by adequate, substantial and credible evidence.'" Oceanside Charter Sch. v. N.J. State Dep't of Educ., 418 N.J. Super. 1, 9 (App. Div. 2011) (quoting In re Taylor, 158 N.J. 644, 656 (1999)).

"A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting Herrmann, 192 N.J. at 28)).

A-0596-17T2

For those reasons, "an appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence" in the record as a whole. In re Virtua-W. Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006). That said, appellate courts review an agency's interpretation of a statute or case law de novo. Russo, 206 N.J. at 27.

With those principles in mind, we consider whether the Board's decision was arbitrary, capricious, unreasonable, or unsupported by substantial evidence in the record as a whole.

III.

Like all public retirement systems, the SPRS provides for both ordinary, N.J.S.A. 53:5A-9, and accidental, N.J.S.A. 53:5A-10, disability benefits. The principal difference between ordinary and accidental disability retirement "is that ordinary disability retirement need not have a work connection." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 42 (2008). Accidental

24

disability retirees receive significantly greater benefits than those provided to ordinary disability retirees.  Patterson, 194 N.J. at 43 (citing Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 193 n.2 (2007)).

A member, meeting the age and service criteria, may be retired on an ordinary allowance provided the member "is mentally or physically incapacitated for the performance of his usual duty and of any other available duty" and "such incapacity is likely to be permanent and of such an extent that he should be retired."  N.J.S.A. 53:5A-9(a).  "Essentially, a qualified member who is permanently disabled for any reason will qualify for ordinary disability." Patterson, 194 N.J. at 42.

The SPRS also allows for accidental disability retirement benefits if "the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties."  N.J.S.A. 53:5A-10(a).  Eligibility to collect accidental disability benefits requires a claimant to meet each of the following elements:

    1. that he is permanently and totally disabled;

    2. as a direct result of a traumatic event that is

        a. identifiable as to time and place,

        b. undesigned and unexpected, and

A-0596-17T2

c. caused by a circumstance external to the member (not the result of preexisting disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Patterson, 194 N.J. at 43 (quoting Richardson, 192 N.J. at 212-13).]

In order to qualify for accidental disability retirement benefits, an applicant must meet:

an extraordinarily high threshold that culls out all minor injuries; all major injuries that have fully resolved; all partial or temporary disabilities; and all cases in which a member can continue to work in some other capacity. In addition, the injury must occur during and as a result of the member's performance of his job duties, thus eliminating disabilities that are sustained outside of work.

[Ibid. (quoting Richardson, 192 N.J. at 195).]

The inclusion of the "direct result" requirement in the 1966 amendment was intended "to impose a more exacting standard of medical causation" and to reject the concept that the impact of ordinary work effort upon a progressive

disease constitutes an "accident" for purposes of awarding accidental disability retirement benefits. Gerba v. Bd. of Trs., Pub. Emps. Ret. Sys., 83 N.J. 174, 185-86 (1980). "Where there exists an underlying condition such as osteoarthritis which itself has not been directly caused, but is only aggravated or ignited, by the trauma, then the resulting disability is, in statutory parlance, 'ordinary' rather than 'accidental' and gives rise to 'ordinary' pension benefits." Id. at 186. The "traumatic event" must constitute "the essential significant or substantial contributing cause of the ultimate disability." Id. at 188. In Richardson, the Court adopted the same standard for the PFRS and the SPRS. 192 N.J. at 192 n.1.

At issue here is whether petitioner suffered a far lateral herniated disc as a result of the accident that rendered him permanently and totally disabled from performing his regular or assigned duties as a state trooper. Based upon our review of the record in light of these legal standards, we are satisfied the Board's decision is supported by adequate, substantial, credible evidence in the record. We therefore find no basis to disturb its decision.

Petitioner relies heavily on our decision in Petrucelli v. Bd. of Trs., Pub. Emps. Ret. Sys., where we reversed the denial of accidental disability retirement benefits to a State employee "whose non-symptomatic arthritic and structural

27

changes . . . were activated into painful symptomatology as a result of [a] severe fall." 211 N.J. Super. 280, 285 (App. Div. 1986). Petitioner argues Petrucelli holds the "direct result" requirement is satisfied when an asymptomatic pre-existing condition is rendered symptomatic by a traumatic event. We disagree; the facts in Petrucelli are distinguishable.

Petrucelli involved a 49-year-old employee with a work history of heavy labor who fell down a nine-step stairwell, rendering his previously unknown and asymptomatic lumbar spondylolithesis condition permanently and totally disabling. Id. at 288-89. We recognized "that 'the traumatic event need not be the sole or exclusive cause of the disability' in all instances." Id. at 288 (quoting Gerba, 83 N.J. at 187).

In Petrucelli, the State's expert conceded that, absent the accident, Petrucelli might "have worked to age 62, as planned, and retired uneventfully." Id. at 289. We concluded it was "entirely speculative" on the record before us, whether Petrucelli "would have developed low-back symptoms independently of the 1981 fall." Ibid.

The record in this matter is readily distinguishable. Petrucelli did not involve the relative credibility of conflicting expert testimony. It is also clear that petitioner's hip arthritis was "advanced and severe" when the first x-rays

and MRI were taken shortly after the accident. Dr. Radcliff did not testify about petitioner's hip condition. His other treating physicians and IME physicians did not opine that his hip arthritis would have remained quiescent absent the accident, much less until normal retirement age. On the contrary, they opined the arthritis was advancing rapidly. Notably, petitioner's physicians did not opine when petitioner's hip condition started, the effect of the accident on that underlying condition, or the timeline for advancement of the condition absent the accident. In addition, unlike in Petrucelli, Dr. Lakin did not concede the condition may have remained asymptomatic without the accident. More fundamentally, petitioner's own testimony and his hip surgeon's records demonstrate the hip replacement surgery was successful and his hip was largely pain free following recovery from the joint replacement.

With regard to the causality of petitioner's disc herniation, the expert testimony was largely in conflict. The record also contained considerable evidence disputing whether the lumbar condition was totally disabling. Indeed, the disability application does not even mention the lumbar condition as a basis for granting accidental disability retirement benefits.

Petitioner also argues that due to his special training and experience as a spinal surgeon, and being a treating physician of petitioner, Dr. Radcliff's

testimony should have been given more weight than Dr. Lakin's testimony. Generally, "where the medical testimony is in conflict, greater weight should be accorded to the testimony of the treating physician" as opposed to an evaluating physician who has examined the employee on only one occasion. Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171-72 (App. Div. 1956); accord Mernick v. Div. of Motor Vehicles, 328 N.J. Super. 512, 522 (App. Div. 2000). "Nevertheless, expert testimony need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience." Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) (citing In re Yaccarino, 117 N.J. 175, 196 (1989)). Accordingly, "[t]he factfinder may accept some of the expert's testimony and reject the rest." Id. at 430 (citing Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993)). "That is, a factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence." Id. at 431 (citing Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 438 (App. Div. 1997)). "Indeed, a judge is not obligated to accept an expert's opinion, even if the expert was 'impressive.'" State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004) (quoting State v. Carpenter, 268 N.J. Super. 378, 383 (App. Div. 1993)).

A-0596-17T2

The weight accorded to expert testimony "is within the competence of the fact-finder." LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). The fact-finder is free to "accept some of the expert's testimony and reject the rest." M.J.K., 369 N.J. Super. at 549; see also In re Civil Commitment of R.F., 217 N.J. 152, 174 (2014). In that regard, the fact-finder, rather than a reviewing court, "is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded her testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999) (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)).

"[T]he weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated." State v. Jenewicz, 193 N.J. 440, 466 (2008) (quoting Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)). The weight given to expert testimony also depends on whether the expert's "conclusions are based largely on the subjective complaints of the patient." Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961). The same reasoning applies with equal force to lay witnesses.

"The choice of accepting or rejecting testimony of witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Oceanside Charter Sch., 418 N.J. Super. at 9 (quoting In

31

re Application of Howard Sav. Bank, 143 N.J. Super. 1, 9 (App. Div. 1976)). Deference is "especially appropriate when the evidence is largely testimonial and involves questions of credibility." In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997).

Petitioner has the burden of demonstrating the accident "constitutes the essential significant or substantial contributing cause of the ultimate permanent disability," a burden the ALJ concluded petitioner did not meet. Gerba, 83 N.J. at 188. The testimony the ALJ found credible, medical records, and the fact petitioner returned to full duty for more than seven months without any restrictions serve as adequate, substantial, credible evidence to support the ALJ's decision and the Board's adoption of that decision. Applying our deferential standard of review, we affirm the Board's final decision denying petitioner accidental disability retirement benefits.

Petitioner's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0596-17T2