**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5277-17T1

BRETT G. MOONEN,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION
AND ANNUITY FUND,

    Respondent-Respondent.

_____

Argued November 20, 2019 – Decided March 6, 2020

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury, TPAF No. 1-10-166995.

Richard A. Friedman argued the cause for appellant (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Richard A. Friedman, of counsel and on the briefs; Edward M. Suarez, Jr., on the briefs).

Austin J. Edwards, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant

Attorney General, of counsel; Austin J. Edwards, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Brett Moonen appeals from a June 12, 2018 final agency decision of the Board of Trustees (Board) of the Teachers' Pension and Annuity Fund (TPAF), adopting an Administrative Law Judge's (ALJ) initial decision. The ALJ affirmed the Board's denial of Moonen's application for accidental disability retirement benefits in connection with injuries he sustained following an assault by a student. We affirm.

By way of background, a TPAF "member, under [sixty-five] years of age," is eligible for an accidental disability retirement pension "if said member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his [or her] regular or assigned duties." N.J.S.A. 18A:66-39(c). Before considering such an application, a physician designated by the Board

> shall have certified to the [B]oard that [the member] is physically or mentally incapacitated for the performance of duty, and should be retired, and the employer shall have certified to the [B]oard that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular and assigned duties, the time and place where the duty causing the disability was performed, that the disability was not the

result of his willful negligence[,] and that the member should be retired.

[Ibid. (emphasis added).]

In Richardson v. Board of Trustees, Police and Firemen's Retirement System, 192 N.J. 189 (2007), the Court clarified the meaning of the term "traumatic event" and set forth a five-pronged standard, requiring a pension system member seeking accidental disability benefits to prove:

1. that he is permanently and totally disabled;

2. as a direct result of a traumatic event that is

    a. identifiable as to time and place,

    b. undesigned and unexpected, and

    c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing [the member's] usual or any other duty.

[Id. at 212-13.]

As to the meaning of the "direct result" language, particularly "in cases where . . . the disability may be causally related in some measure to an antecedent or underlying physical condition as well as to the traumatic event," in Gerba v. Board of Trustees, Public Employees' Retirement System, 83 N.J. 174, 185 (1980), the Court explained that what is now required "is a traumatic event that constitutes the essential significant or the substantial contributing cause of the resultant disability" "even though it acts in combination with an underlying physical disease." Id. at 186-87.

On February 22, 2016, sixty-three-year-old Brett Moonen, then an eighteen-year veteran science teacher in the Camden School District, applied for accidental disability retirement benefits based on injuries sustained on November 13, 2015, when he was assaulted by a student. On December 1, 2016, the Board denied Moonen's application. "Although the Board found that the incident described was identifiable as to time and place and . . . was undesigned and unexpected, there [was] no evidence in the record of direct causation of a total and permanent disability." Specifically, "the Board could find no evidence that the event was objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Additionally, the Board determined Moonen was "not totally and permanently disabled from the

performance of [his] regular and assigned job duties," and "not physically or mentally incapacitated from the performance of [his] usual or other duties that [his] employer [was] willing to offer."

After Moonen filed an administrative appeal of the Board's decision, on January 13, 2017, the matter was transmitted to the Office of Administrative Law (OAL) as a contested case. See N.J.S.A. 52:14B-1 to -15; N.J.S.A. 52:14F-1 to -13. During the ensuing OAL hearing, conducted on August 2 and 23, 2017, Moonen, and two experts testified, David Ellis, Ph.D., Moonen's treating neuropsychologist, and Mark Chelder, Ph.D., a neuropsychologist designated by the Board. Additionally, numerous medical reports by both of the two testifying experts as well as non-testifying medical professionals were admitted into evidence.

Moonen detailed his educational background and job duties as a teacher. He also testified about the incident, his injuries, his resulting symptoms, his treatment, and his preexisting medical conditions. According to Moonen, at approximately 2:00 p.m. on November 13, 2015, while his students were completing their lab assignment, three unfamiliar students entered his classroom, roamed around, and refused to leave despite Moonen's request. When one of the students approached Moonen "menacing[ly]," "scared to death"

and fearing that the student was going to harm him, Moonen threw "a beaker of vinegar" "at [the student's] shirt." After throwing the vinegar, Moonen had no memory of what transpired until he "was being picked [up] off the floor by . . . the security guards." He knew he had been "knocked unconscious" but "did not know how long [he] was knocked out." After he was picked up, he was "very confused," "dizzy," and unable to "stand by [him]self right away." He felt "pain on the [left] side of [his] head as if [he] had been hit with something." His "vision was blurry" and his "hearing was affected."

After the assault, Moonen was transported by ambulance to Our Lady of Lourdes Hospital where he underwent a CT scan and was diagnosed with "left temporal intracranial hemorrhage," described as "a bleed in the brain." Thereafter, Moonen was transported by ambulance to Cooper Hospital's trauma unit where he underwent a sonogram, was again diagnosed with "intracranial hemorrhage," and released around 4:30 p.m. the following day with instructions to follow up with Dr. Jonathan Bussey, a neurologist. On December 3, 2015, Moonen followed up with Dr. Bussey, who determined that a subsequent CT scan showed "complete resolution of the hemorrhage and no other intracranial pathology." However, if Moonen's "post[]concussive issues continue[d],"

6

Bussey recommended that he "follow up with the concussion specialists at Cooper."

Subsequently, on December 10, 2015, Moonen was examined by Dr. Tariq Siddiqi, a worker's compensation doctor, who diagnosed him with post-concussion syndrome and headaches, and recommended vestibular therapy three times per week for four weeks. By January 25, 2016, Dr. Siddiqi determined Moonen was able to return to work at "full duty." However, Moonen was too afraid to return to teaching, and only returned to Camden High School once after the incident "to turn in" a computer he had borrowed from the school.

Moonen "anticipated that [he] would" have "panic attacks" if he had to return to the classroom because he continued to have "anxiety" and difficulty sleeping as a result of the assault. His anxiety also caused "ang[er]" and "impatien[ce]," which he feared would be unleashed on the students and school staff. Aside from the anxiety, since the assault, Moonen struggled with "typing" and "writ[ing,]" which impeded his ability to "function as a teacher." He also "had a hard time going up and down stairs," which would make it difficult for him to navigate the school. Additionally, he "constantly" felt "dizzy," and his "memory was severely damaged," which made it difficult to "remember [students'] names" or create and follow lesson plans. At home, Moonen had

7

difficulty with household tasks, such as shopping, cooking, and paying bills, and never drove alone if he was unfamiliar with the route.

Moonen acknowledged that, prior to the assault, he "had a stroke in January of 2015," that left him with "coordination" "problems . . . with [his] right hand." Moonen was also "taken to the ER of Our Lady of Lourdes and evaluated for a possible stroke" in June 2015. However, according to Moonen, he had recovered sufficiently from the stroke incidents to return to work. Moonen also acknowledged "a history of migraine variances" since he was about thirty-years-old, that caused "dizziness," "problems with [his] speech" and "decreased peripheral vision." Additionally, before the assault, Moonen was "diagnosed . . . with white matter disease," a "non-traumatic brain injur[y]" caused by "clogged or . . . blocked blood vessels," as well as "chronic microvascular ischemic disease." He also suffered from "depression," for which he was prescribed medication.

Instead of returning to Camden High School after Dr. Siddiqi "cleared [him]," Moonen used his "sick days" and consulted with other doctors. On March 24, 2016, Moonen was examined by Dr. Glenn McLintock, his primary care physician since 2012. In a letter to the Board, Dr. McLintock stated that as a result of the assault, Moonen was suffering from cognitive impairments,

8

hearing loss, balance problems, obstructive sleep apnea, anxiety, and post-traumatic stress disorder (PTSD) requiring continuing psychiatry. McLintock acknowledged that Moonen had "a history of previous stroke," and had "tested positive for [chronic autosomal dominant arteriopathy and subcortical infarcts and leukoencephalopathy (CADASIL)], a condition that . . . predispose[s] [you] to ischemic stroke."

Nonetheless, McLintock opined that Moonen's disabling "symptoms did not occur until after the assault." Without the assault, McLintock believed Moonen "would likely still be able to work as a teacher." However, given the amount of time that had elapsed since the assault, McLintock believed "it [was] unlikely that [Moonen would] recover from these deficits." According to McLintock, given the "memory deficits and difficulties with executive function, not to mention the PTSD and anxiety symptoms that would be triggered by returning to the classroom," Moonen was "totally and permanently disabled from the performance of work duties as a teacher" as "a direct result of the traumatic assault of November 13, 2015."

Likewise, Dr. Herman Barb, Moonen's treating psychiatrist since 2003, stated in a January 23, 2017 report that Moonen was "sufficiently cognitively and emotionally impaired from the assault" that he was "totally and permanently

disabled" as a direct result, and "mentally incapacitated from performing his usual work duties or any other duty."  Barb referred Moonen to Dr. Ellis for treatment, which began on March 2, 2016.  During the course of treatment, Ellis conducted a comprehensive neuropsychological examination of Moonen, as a result of which Ellis diagnosed Moonen with "post concussive disorder," mild neuro-cognitive disorder "due to traumatic brain injury," "mild vascular neuro-cognitive disorder," PTSD, anxiety, and depression.

Ellis explained that the neuropsychological examination involved "specific discreet tests" as well as "omnibus tests" that evaluated multiple areas of "brain function," including executive functioning,[1] "sensory functioning, motor functioning[,][2] and emotional [issues]."  The tests consisted of both "objective" and "subjective" elements.  According to Ellis, while the "objective tests have right and wrong answers," he believed Moonen was being honest with his answers to the subjective tests "from looking at consistent patterns in the tests themselves."

---

[1] Ellis described executive functioning as "the ability to plan, . . . organize and . . . think through things."

[2] Ellis testified "motor issues . . . basically measure . . . fine . . . and gross motor ability."

Based on Moonen's test scores, Ellis concluded Moonen had deficiencies in "attention," "concentration," "verbal memory," "motor behaviors," and "executive functioning." Ellis explained that "[t]he attention concentration areas" indicated "that [Moonen] was having difficulty . . . paying attention to whatever was being asked at times." Ellis testified that although Moonen's deficits in these areas were not "in the severely impaired range," when considering Moonen's "previous education and . . . skill levels, both as a graduate of West Point as well as then getting his MBA, these performance areas [were] quite deficient," and made teaching "impossible." Comparing Moonen to other "brain injured" patients, Ellis concluded "he was more similar to the mild traumatic brain injury" patients.

Upon reviewing his medical history, Ellis acknowledged that Moonen had "a stroke in 2015" that left him with residual numbness, tingling, weakness in his right hand, and a "[t]ransient [i]schemic [a]ttack" (TIA) related to CADASIL. Ellis admitted that the side effects of a stroke included memory loss and problems with organization and attention. He also acknowledged that prior to the assault, Moonen had "a history of dizziness" and "feeling off balance." Additionally, prior to the assault, he had been diagnosed with "widespread confluent white matter hyperintensities," "in both hemispheres" of the brain,

11

(also known as white matter disease), which symptoms included "trouble with memory," "balance," and "problem solving."

Notwithstanding these preexisting conditions as well as any treatment effect from the "fifty-five" times he saw Moonen, Ellis concluded that "[i]n [his] professional neuropsychological/medical opinion[,] the test data . . . indicated continued and permanent neuropsychological impairments that were a direct consequence of the work related injur[ies] on November 13, 2015." Ellis opined to "a reasonable degree of medical/neuropsychological certainty" that as a result of "both traumatic brain injury, and [PTSD]" stemming from the work-related injury, "Moonen was permanently disabled" and unable "to successfully complete his job as a teacher."

In contrast, Dr. Chelder disagreed with Ellis' opinion that Moonen was totally and permanently disabled from the performance of his duties as a teacher. On August 24, 2016, Chelder conducted an evaluation of Moonen, which included "a clinical interview," the administration of "a self-directed [p]ersonality [a]ssessment," and a review of Moonen's medical background, symptoms, current treatment, work history, and ability to return to work. Chelder also reviewed the "[j]ob [d]escription . . . provided . . . by the State."

Based on his past medical history, Chelder found it noteworthy that since he was thirty-years-old, Moonen reported significant "[m]igraine headaches," with stroke-like symptoms, "that included peripheral vision problems, language problems[,] and paresthesias which [was] . . . numbness and tingling." Chelder also stressed that Moonen had in fact suffered a stroke in January 2015, as a result of which he "[d]eveloped right-sided numbness and decreased motor function," and suffered stroke-like symptoms in June 2015, including "[v]ertigo, syncope and dizziness." Additionally, according to Chelder, "prior MRIs revealed significant[] '[w]hite matter disease.'" Chelder also noted that Moonen had "a prior history of depression and had been treating with anti-depressant medications," and suffered from "sleep apnea," which required him to regularly use a "CPAP machine" when sleeping.

Chelder also reviewed a December 2, 2015 report prepared by Dr. Steven Russell Messe, a neurologist, who examined Moonen at the request of McLintock. In the report, Dr. Messe noted that "[o]rientation, fund of knowledge, attention and concentration, language skills and executive functions were all within normal limits." Similarly, Chelder reviewed Dr. Bussey's December 3, 2015 report, indicating that while Moonen "report[ed] having some thought cloudiness and memory issues," Bussey's examination revealed that

13

Moonen's "speech was within normal limits, [his] memory appeared intact, [and his] fund of information was normal."

Chelder questioned Ellis' omission of certain test scores from his report. According to Chelder, "[b]y highlighting the areas of deficit" and omitting other scores, Ellis prevented "the reader" from "plac[ing] the full evaluation in perspective," and left the reader "guessing about the rest of [Moonen's] performance."[3] Additionally, Chelder disagreed with Ellis' diagnosis of PTSD. Chelder testified that the personality assessment he performed on Moonen "revealed a normal range profile" with no indications that Moonen had "increased depression, increased anxiety[,] or anything related to [PTSD]." Although Chelder agreed with Ellis that Moonen suffered from "[m]ild [n]eurocognitive [d]isorder," he "believe[d] that the cognitive deficits as measured by . . . Ellis' evaluation [were not] as severe as . . . Ellis was interpreting them to be."

Chelder concluded that:

> It [was his] professional opinion, rendered with a reasonable degree of clinical certainty, that the results of th[e] present psychological evaluation do not provide sufficient evidence that [Moonen's] mild cognitive deficits can be causally related to the work place assault

---

[3]   Chelder testified that he had requested the "raw testing data for a more complete analysis of [Ellis'] evaluation" but it was never provided.

that occurred on [November 13, 2015]. Prior to this injury, [Moonen's] brain scans revealed evidence of atrophy and white matter disease that certainly could be causing the isolated mild cognitive deficits . . . . In addition, there was no evidence that [Moonen] continued to experience any elevated levels of psychological distress.

It [was his] opinion, therefore, that [Moonen] cannot be considered permanently and totally disabled from performing the job duties of a [t]eacher as there is no consistent evidence of a significant psychological disorder. In addition, there was limited evidence of significant neurocognitive dysfunction.

Following the hearing, the ALJ affirmed the Board's denial of accidental disability retirement benefits. Concluding that the "case involve[d] a physical assault in Camden High School and the alleged resulting residual mental disorders," the judge determined that "[t]he analysis" was governed by the "standards articulated in Richardson." "[B]ased upon a review of the totality of the evidence," the judge found that Moonen "was not permanently and totally disabled and unable to perform the duties and functions of his job."

In his comprehensive twenty-one page decision, the judge initially posited that "[t]he outcome of th[e] case turn[ed] on the credibility of the medical experts." Although, the judge found that both Ellis and Chelder were "credible, competent witnesses," the judge determined that Chelder "presented a more logical and persuasive opinion as to the issue of permanent and total disability

15

and [Moonen's] ability to perform the functions and duties of his job as a teacher."

Specifically, the judge described Ellis' "objective findings" as "confusing," "incomplete," "conclusory in nature and ill supported by any concrete evidence." According to the judge, Ellis "candidly acknowledged that his opinion was influenced by [Moonen's] subjective complaints," and "conceded that Moonen had a family history of dementia" and a history of "several cerebral vascular accidents[,] including a stroke[]." Ellis also "agreed that Moonen suffer[ed] from 'white-matter disease,' tested positive for CADASIL[,] and ha[d] a history of migraines since age thirty." "Yet, it was his opinion that 'his disability was all related to the November 2015 assault.'" The judge also pointed out that "Ellis found that Moonen's executive functions were disabled following the 2015 incident," despite "Dr. Messe not[ing] that Moonen's executive functions were all within normal limits" and "Dr. Bussey diagnos[ing] Moonen with only temporary conditions consisting of a contusion and loss of consciousness."

Conversely, according to the judge, Chelder "made objective findings which, when compared to the demands of [Moonen's] duties, led to a conclusion that Moonen is not permanently and totally disabled from working as a teacher."

16

In fact, Chelder's finding "that Moonen's cognitive dysfunction was not severe enough to interfere with his ability to teach" was confirmed by Ellis' "finding that Moonen's issues with verbal memory, concentration, and motor behaviors 'were not severe.'" Additionally, while Chelder's finding that Moonen did not exhibit symptoms of PTSD was based on his administration of a "personality assessment," Ellis "admitted that the tests he conducted relat[ing] to PTSD and emotional issues were self-reported and subjective."

The judge acknowledged that "[a]s a general rule, 'where the medical testimony is in conflict, greater weight should be accorded to the testimony of the treating physician' as opposed to an evaluating physician, who has only met with the employee on one occasion." However, the judge noted that "this guidepost [was] not un-waivable." The judge determined that "[o]n balance, . . . Chelder offered a more logical explanation in evaluating [Moonen's] condition[s]." As a result, the judge "afford[ed] greater weight to his opinions regarding the nature and permanency of those conditions."

The judge explained:

> Chelder[] provided credible testimony and a sound medical opinion that was based on a detailed and thorough review of medical records and hands-on evaluation of [Moonen]. He opined, to a reasonable degree of medical certainty, that [Moonen] is able to perform his duties as a teacher and the cause of any

17

dysfunction is not the result of the incident[,] but rather of the "white matter"[4] in his brain. Ultimately, [Moonen] has not presented a more compelling case for total and permanent disability than respondent has for non-disability.

The judge therefore concluded that Moonen neither proved "by a preponderance of the credible evidence that he [was] permanently and totally disabled from his regular and assigned duties as [a] teacher, . . . that he [was] physically incapacitated from performing his usual or any other duty that his employer [was] willing to offer," nor that "his disability occurred as a direct result of a traumatic event, as the work accident was not the essential significant or substantial contributing cause of [Moonen's] disability." After considering Moonen's exceptions, on June 12, 2018, the Board adopted the ALJ's decision, and this appeal followed.

On appeal, Moonen argues "the ALJ's determinations of expert witness credibility were not supported by substantial evidence in the record," and "the ALJ failed to give due consideration and weight to the expert testimony of [Moonen's] treating neuropsychologist, or to the reports of [Moonen's] other long-time treating doctors." Moonen asserts that "[i]nstead, the ALJ uncritically accepted conclusions by [the Board's] expert that were insufficiently grounded

---

[4] We presume this reference is to Moonen's diagnosis of white matter disease.

in the underlying medical facts," particularly since the Board's expert "failed to review all of the medical information" he believed was "necessary to fully evaluate Moonen's cognitive disability claim." According to Moonen, because the ALJ's findings are "riddled with material factual errors and inconsistencies with the evidence of record," the Board's adoption of the ALJ's decision "is a textbook example of an arbitrary, capricious, and unreasonable . . . administrative action." We disagree.[5]

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). Reviewing courts presume the validity of the "administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). For those reasons, "an appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In

---

[5] Moonen correctly points out that the ALJ mistakenly stated in his analysis that he "return[ed] to work" after the assault. However, inasmuch as the ALJ credited Moonen's account that "[h]e did not return [to work]" after he was cleared by Siddiqi "because he was afraid of being assaulted again by students," based on the totality of the record, we deem this error to be of no moment. See Gerba, 83 N.J. at 189.

re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious[,] or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

"Where . . . the [agency's] determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Gerba, 83 N.J. at 189. "[T]he test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Brady v. Bd. of Review, 152 N.J. 197, 210 (1997) (quoting Charatan v. Bd. of Review, 200 N.J. Super. 74, 79 (App. Div. 1985)). That said, appellate courts review de novo an agency's interpretation of a statute or case law. Russo, 206 N.J. at 27.

Applying these principles, we are satisfied the medical testimony and records support the ALJ's decision and the Board's adoption of that decision. Because the Board's determination was amply supported by credible evidence, and was neither arbitrary, capricious, nor unreasonable, we discern no basis to

intervene. The crux of Moonen's challenge is that the ALJ erred in his assessment of the testimony and credibility of the experts, and thus erred in concluding he failed to meet his burden of proof. An individual seeking accidental disability retirement benefits must prove a disabling permanent injury, and must produce "such expert evidence as is required to sustain that burden." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 51 (2008). We give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility," In re Taylor, 158 N.J. 644, 656 (1999) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)), and defer to credibility findings "that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999).

Both "the credibility of the expert and the weight to be accorded his testimony rests in the domain of the trier of fact." Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86 (App. Div. 1961). See also LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001) ("[T]he weight to be given to the evidence of experts is within the competence of the fact-finder."). "To aid such determinations, our courts have developed a guidepost—where the medical testimony is in conflict, greater weight should be

accorded to the testimony of the treating physician." Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171 (App. Div. 1955). However, this guidepost is not conclusive, and the factfinder is not obligated to accept an expert's opinion, even if the expert was "impressive." State v. Carpenter, 268 N.J. Super. 378, 383 (App. Div. 1993). Indeed, the factfinder may accept some of the expert's testimony and reject the rest, Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993), even if that testimony is unrebutted by any other evidence. Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 438 (App. Div. 1997).

In essence, the factfinder, must use "common sense and ordinary experience," In re Yaccarino, 117 N.J. 175, 196 (1989), particularly "when, as here, the factfinder is confronted with directly divergent opinions expressed by the experts." State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004). "[T]he expert's statements are to be sifted . . . like other testimony." Angel, 66 N.J. Super. at 86. Factors to consider in evaluating "[t]he testimonial and experiential weaknesses of the [expert] witness," include "his status as a general practitioner, testifying as to a specialty," "the fact that his conclusions are based largely on the subjective complaints of the patient or on a cursory examination," and whether his "premises, as well as his ultimate conclusions," are

"contradicted by rebuttal experts and by other evidence of the opposing party." Ibid. (citing Panko v. Grimes, 40 N.J. Super. 588, 596 (App. Div. 1956)).

In turn, while the Board is less constrained in reviewing findings based upon expert witness testimony, see ZRB, LLC v. N.J. Dep't of Envtl. Prot., 403 N.J. Super. 531, 561 (App. Div. 2008), ultimately, "the choice of accepting or rejecting the testimony of witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Renan Realty Corp. v. State, Dep't of Cmty. Affairs, Bureau of Hous. Inspection, 182 N.J. Super. 415, 421 (App. Div. 1981). Here, the Board's adoption of the ALJ's factual findings, based on the ALJ's credibility determinations, is reasonable and supported by the record. "That [the ALJ] gave more weight to the opinion of one physician as opposed to the other provides no reason to reverse this [decision]." Smith v. John L. Montgomery Nursing Home, 327 N.J. Super. 575, 579 (App. Div. 2000). "We rely upon the expertise of the [Board] to separate legitimate from illegitimate claims," Patterson, 194 N.J. at 51, and we are satisfied that the Board's "determination [here] is founded upon sufficient credible evidence seen from the totality of the record." Gerba, 83 N.J. at 189. See R. 2:11-3(e)(1)(D).

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5277-17T1